BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
**FOX ROTHSCHILD LLP**
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
BAxelrod@foxrothschild.com
*Counsel for Timothy L. Blixseth*

Electronically Filed April 20, 2011

Fox Rothschild LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>TIMOTHY L. BLIXSETH,<br><br>Alleged Debtor. | Case No. BK-S-11-15010-BAM<br><br>Chapter 7 (Involuntary)<br><br>**DECLARATION OF TIMOTHY L. BLIXSETH IN SUPPORT OF MOTION TO DISMISS**<br><br>Hearing Date: April 22, 2011<br>Hearing Time: 1:00 p.m. |

I, Timothy L. Blixseth, declare as follows:

1. I am the alleged debtor in this involuntary bankruptcy case.

2. I have personal knowledge of the facts state herein.

3. If called upon to testify I could and would testify to the facts stated to herein.

4. I reside in the City of Medina, State of Washington. Medina is the place that I call home when I am away. I have resided in Medina since June of 2007. Prior to that, I was a resident and domicile of the State of California.

5. I have no residence in the State of Nevada, nor have I ever resided in the State of Nevada.

6. I conduct no business in the State of Nevada.

7. I have no assets in the State of Nevada.

8. I have no place of business in the State of Nevada.

9. I own no property in the State of Nevada.

10. As of today's date, my personal bills are current as are my undisputed and outstanding debt obligations of which I am aware. For the most part, such obligations were for professional fees that I have incurred over the last two years in defending myself against a host of litigation, primarily in the Montana bankruptcy court and disputing state tax claims. As of April 20, 2011, I have also satisfied the tax claims of the State of California and the State of Idaho, through settlement agreements. However, such claims at the time that the involuntary petition was filed were contingent and disputed because, among other reasons, they were subject to setoff based on tax refunds that remain due to me, particularly with respect to the State of California. In satisfying the claims of Idaho and California, I have reserved my right to seek such refunds and setoffs. Attached as **Exhibits 1** and **2** hereto are copies of the Settlement Agreements that I reached with California and Idaho. However, I am submitting these Agreements under seal. Attached as Exhibits **3** and **4** are notices of withdrawal that the California and Idaho taxing authorities have executed and sent to the Nevada bankruptcy court for filing. Also submitted under seal as **Exhibit 5** are copies of my recent consumer debt billing statements to demonstrate to the Court that I am current on such obligations.

11. In 1999, I founded the Yellowstone Mountain Club which is located in Big Sky, Montana.

12. Through a couple entities, I owned the majority interest in the Yellowstone Mountain Club. I was a 100% owner of the BGI, Inc., an Oregon corporation, which was the manager and approximate 85% owner of the entities that owned the Yellowstone Mountain Club.

13. In December of 2006, my ex-wife, Edra D. Blixseth, filed for divorce in Los Angeles County Superior Court. On August of 2008, Edra and I formally divided our marital community assets pursuant to our Marital Settlement Agreement ("**MSA**"). On October 7, 2008, the Los Angeles County Superior Court entered a final order on Edra's divorce petition which had the effect of dissolving our marital community and approving the division of our marital assets pursuant to the MSA. This final order ended years of highly contentious divorce litigation where we both spent millions of dollars on attorneys and accountant fees.

Fox Rothschild LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169





Fox Rothschild LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169

14. In January of 2008, through BGI, I entered into a contract to sell the Yellowstone Club to a private equity group in Boston called CrossHarbor Capital Partners LLC for $455 million. The closing on this sale was to occur on or about March 25, 2008. Unfortunately, Edra thought the $455 million contract price was too low so she interfered on numerous occasions with that contract by trying to obtain other buyers for the Club and communicate directly with CrossHarbor's principle, Sam Byrne. Edra's interference in the sale of the Club resulted in two injunctions being entered against her to stop her conduct but she violated those injunctions anyway.

15. On or about March 24, 2008, CrossHarbor terminated its contract to buy the Club for $455 million. Subsequently, Edra and CrossHarbor began negotiating directly to work out a deal whereby Edra would obtain ownership of the Club out of our divorce, and CrossHarbor would then partner with Edra to develop the Club. As part of its deal with Edra, CrossHarbor promised to loan Edra $35 million so that she could buy-out my interest in the Club and therefore get the Club out of the divorce. Also as part of this deal, CrossHarbor promised to promptly inject $100 million in capital into the Club and takeover the financial operations of the Club. To induce Edra into this deal, CrossHarbor created detailed financial projections that it provided to Edra wherein CrossHarbor showed how CrossHarbor intended to develop the Club over the next several years. In these detailed financial projections, CrossHarbor represented to Edra that she would profit over $600 million dollars if she partnered with CrossHarbor in developing the Club. Not surprisingly, Edra agreed to this deal with CrossHarbor and so on August 12, 2008 CrossHarbor funded Edra's buyout of my interest in the Club and the division of our marital assets was therefore effected on that date pursuant to the MSA.

16. Because Edra received all of my marital community interest in the Yellowstone Club and its related entities as part of the MSA, I retained no interest in any entity that owned the Yellowstone Club. Edra received my 100% interest in BGI, Inc. as part of the MSA, as well as all my interest in the Yellowstone Club entities themselves.

17. For my part, once the MSA was consummated in August of 2008, I transferred all





of my assets into a limited liability limited partnership called Desert Ranch LLLP, which is formed under the laws of the State of Nevada. Within Desert Ranch LLLP, I am a 98% limited partner. Desert Ranch LLLP is merely a holding company for a number of non-Nevada entities whose principal assets are real estate holdings in Idaho, Washington, California, the country of Mexico and the country of Turks & Caicos.

18. The original of the Partnership Agreement for Desert Ranch LLLP which reflects my 98% limited partnership interest is maintained at the offices of my tax counsel, Thornton Byron LLP located in Boise, Idaho. The corporate records of Desert Ranch LLLP are also maintained by Thornton Byron, LLP and the bookkeeping for Desert Ranch LLLP is conducted in Ranch Mirage, California.

19. The remaining 2% interest of Desert Ranch LLLP is held by its general partner, Desert Ranch Management LLC, a Nevada limited liability company. I hold a 40% ownership interest in Desert Ranch Management LLC. Desert Ranch Management LLC's only function is to operate as the general partner of Desert Ranch LLLP.

20. None of the entities held by Desert Ranch LLLP are formed under the laws of the State of Nevada.

21. Moreover, none of the entities held by Desert Ranch LLLP hold assets that are located in the State of Nevada.

22. Desert Ranch LLLP has no office in the State of Nevada, nor are any of the decisions of Desert Ranch LLLP made in the State of Nevada.

23. Likewise, none of the entities held by Desert Ranch LLLP have offices in the State of Nevada, nor are any of the decisions for these entities made in the State of Nevada.

24. Like Desert Ranch LLLP, Desert Ranch Management LLC has no office or place of business in Nevada. Its only asset is its 2% ownership interest in Desert Ranch LLLP. None of its remaining members are Nevada residents or domiciles. No decisions of Desert Ranch Management LLC are made in Nevada.

25. While I thought that consummating the August 2008 MSA would put an end to

Fox Rothschild LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169





the contentious divorce litigation that I had been in since December of 2006 and that I could move on with my life, nothing could have been further from the truth.

26. Although CrossHarbor promised to promptly inject $100 million of capital into the Yellowstone Club, on November 10, 2008, Edra and CrossHarbor put the Yellowstone Club into bankruptcy in Montana. As a result of that bankruptcy several things happened:

(a) CrossHarbor purchased the Club out of the bankruptcy for only $115 million and removed Edra from all ownership of the Club;

(b) Edra filed for bankruptcy in March of 2009 in Montana. Her Chapter 7 bankruptcy trustee has initiated an adversary proceeding in the Montana bankruptcy court to undo the MSA. See Adversary Case No. 10-88 in the U.S. Bankruptcy Court for the District of Montana. I am vigorously litigating this lawsuit;

(c) Several entities related to the Club filed for bankruptcy in Montana around this same time, including Yellowstone Club World and Big Springs Realty LLC. I did not have at the time of their bankruptcy filing time, and do not currently have any ownership or affiliation, as defined under the Bankruptcy Code, direct or indirect, with any entity that has filed for bankruptcy in Montana, nor does Desert Ranch LLLP.

(d) The Yellowstone Mountain Club plan of reorganization called for a liquidating trust to be formed for the purpose of collecting litigation claims and prosecuting adversary proceedings against me on behalf of the Club and creditors of the Club. Within this context, I, and in some cases Desert Ranch LLLP, are defendants in the following adversary proceedings pending in the U.S. Bankruptcy Court for the District of Montana. Adversary Case Nos., 09-14, 09-18, 09-64 and 10-15. I am vigorously defending all of these adversary proceedings, as is Desert Ranch LLLP. A purported judgment has been entered against me in

Fox Rothschild LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169





Adversary Proceeding No. 09-14 for approximately $40 million. However, that judgment is not final and is being appealed by both myself and the plaintiff, the Yellowstone Club Liquidating Trustee. That appeal is currently pending in the U.S. District Court for the District of Montana.

(e) In June of 2009, I appealed the order confirming the Third Amended Plan of Reorganization for the Yellowstone Club on the grounds that it was approved without proper notice and a hearing, in violation of due process and because the order confirming the plan violated 11 U.S.C. § 1129 in that the plan of was not proposed in good faith by CrossHarbor. On November 2, 2010, the U.S. District Court for the District of Montana granted my appeal and reversed the order confirming the Third Amended Plan of Reorganization (hereinafter "Remand Order" attached hereto as **Exhibit 6**). However, CrossHarbor, the Debtors, Credit Suisse and the Liquidating Trust have appealed the Remand Order to the Ninth Circuit Court of Appeals. See Ninth Circuit Consolidated Case No. 10-36038. In response to the appeal to the Ninth Circuit, I filed motions to dismiss those appeals because the Remand Order is not a final appealable order. I also filed a Motion for Reassignment with the Ninth Circuit asking the Ninth Circuit to reassign the Yellowstone Club bankruptcy proceedings to another District because of a plethora of facts which display an appearance of bias that the Montana Bankruptcy Court has against me (discussed below). See Docket Entry No. 22-2, Ninth Circuit Consolidated Case No. 10-36038. The Ninth Circuit has yet to rule on my pending motions to dismiss and reassignment motion. However, on February 9, 2011, the Ninth Circuit issued an order asking for more briefing on the issue of whether the Remand Order is a final appealable order but indicated strongly that it did not believe that it was an appealable order. See Docket

Fox Rothschild LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169

Fox Rothschild LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169

Entry No. 16, Ninth Circuit Case No. 10-36038.

27. Although I, and Desert Ranch LLLP, are defendants in several adversary proceedings pending in the U.S. Bankruptcy Court for the District of Montana, neither I nor Desert Ranch LLLP, nor any entity held by Desert Ranch LLLP are in bankruptcy in the District of Montana. Indeed, neither Desert Ranch LLLP nor any entity that it holds are in bankruptcy at all. Other than the involuntary bankruptcy filed against me in this case, I am not in bankruptcy.

28. It is my considered judgment, the Montana Department of Revenue ("MDOR") signed the involuntary bankruptcy petition in bad faith. According to the involuntary petition, the purported basis for MDOR being an eligible petitioner under 11 U.S.C. § 303 is that it claims to be owed on a $219,258.00 tax claim against me. However, I am currently in litigation against MDOR before the Montana State Tax Appeals Board ("STAB") regarding this $219,258.00 purported tax claim. On February 10, 2011, I timely commenced that litigation by filing a complaint with STAB to avail myself of my administrative remedies under Montana law to dispute an approximately $56 million income tax assessment that MDOR wants to impose against me. See **Exhibit 7** attached hereto ("MDOR Complaint"). A component of this $56 million in taxes that MDOR wants to impose against me and which is the subject of the STAB proceedings is the $219,258.00 tax claim upon which it represents to be an eligible petitioning creditor.

29. On March 15, 2011, MDOR filed a Motion to Strike to remove certain affirmative defenses that I made in my complaint. See **Exhibit 8** attached hereto. In its Motion to Strike MDOR acknowledged that I had timely filed my complaint with STAB. See Motion to Strike at p. 2. My attorneys opposed the Motion to Strike and pointed out that MDOR was in default for failing to timely file an answer to the MDOR Complaint. See **Exhibit 9**. On April 11, 2011, STAB denied MDOR's Motion to Strike. See **Exhibit 10**. Also on April 11, 2011, MDOR filed with STAB a document entitled Notice of Bankruptcy Filing and Motion for Stay ("Motion for Stay"). See **Exhibit 11**. In its Motion for Stay, MDOR acknowledged that my "state tax liability was not finally adjudicated prior to the commencement of the involuntary bankruptcy . . . ."





denied MDOR's motion to strike. Motion to Stay at p. 3. MDOR has yet to file an answer to the MDOR Complaint.

30. Because my tax liability to MDOR is subject to a bona fide dispute and wholly contingent upon resolution of the STAB proceedings, I fail to see how MDOR can be an eligible petitioning creditor. Instead, it is clear to me that MDOR used the involuntary bankruptcy petition to gain a litigation advantage over me in an effort to drain me of the resources to litigate the STAB proceedings. Moreover, I have been informed by attorneys who represent parties with whom I have settled adversary proceedings in Montana that the Liquidating Trustee was working with MDOR to have the involuntary petition filed against me so that the Liquidating Trustee could similarly use this involuntary bankruptcy case to gain a litigation advantage over me with respect to the appeal of the judgment in AP-14 as well my appeal of the Yellowstone Club Third Amended Plan of Reorganization. Both MDOR and the Liquidating Trustee know that if I am put into an involuntary bankruptcy and an order for relief is entered, that I will lose the ability to control my litigation against them in Montana and that defense of that litigation will be transferred to a bankruptcy trustee who will have neither the resources nor the incentive to litigate against MDOR and the Liquidating Trustee.

31. MDOR's Chief, Dan Bucks, has stated to the Associated Press that it filed the involuntary petition to help it collect on its $56 million tax claim against me. See **Exhibit 12** attached hereto. MDOR's conduct therefore is transparently nothing more than an attempt to use an involuntary bankruptcy petition to shortcut the STAB litigation. Additionally, Dan Bucks also told the Associated Press that it filed the involuntary petition when it did because it learned that I had transferred my assets to a Nevada entity (i.e., Desert Ranch LLLP). However, this is simply not the truth. The fact that I transferred my assets to Desert Ranch LLLP in August of 2008 following the MSA has been a matter of public knowledge for years. I transferred my assets to Desert Ranch LLLP as part of my estate planning following my divorce. These facts were made public knowledge as part of the discovery process in AP-14 beginning in 2009. These facts were testified to in the trial of AP-14 during February of 2010 and were set forth in

Fox Rothschild LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169





the Montana Bankruptcy Court's Memorandum of Decision following the trial of AP-14 in August of 2010. See Docket No. 575, AP-14 attached hereto as **Exhibit 13**. MDOR knew of these facts as it was closely monitoring this litigation and in fact had sent representatives to sit in the courtroom during the trial in AP-14 to listen to the facts. I spoke personally with one of the MDOR employees, named Joel Silverman, during the recesses of the proceedings of AP-14.

32. I read in this Court's Order to Show Cause issued on April 9th that it thought Montana might be a better venue to administer this involuntary petition. I respectfully disagree. As an initial matter, I should not be in bankruptcy. The involuntary petition was filed in bad faith by MDOR and the claims of the other two petitioners have since been satisfied. The only purpose served by keeping me in an involuntary bankruptcy is to give MDOR and the Liquidating Trustee a litigation advantage over me so that they can cut through the above-described litigation and appeals and go right to collecting on their disputed and illegitimate claims against me.

33. In fact, me being in bankruptcy will detrimentally impact the lives of dozens of employees, and their families, who work for the various companies held by Desert Ranch LLLP. If I lose my ability to manage and operate those entities held by Desert Ranch LLLP, those employees' livelihoods, as well the livelihoods of their families, will be put in significant jeopardy.

34. Second, in no event would venue in Montana be proper. I am not in bankruptcy in Montana and neither is Desert Ranch LLLP. My primary asset is my 98% limited partnership interest in Desert Ranch LLLP. As described above, Desert Ranch's primary domestic assets are not located in Montana but are non-Montana entities which have real estate holdings located in Idaho, Washington and California.

35. Moreover, because I have been the primary target of repayment for the unsecured creditors of the Yellowstone Mountain Club as well as the bankruptcy estate of Edra Blixseth, the sole active bankruptcy judge in Montana has over the last two and a half years come to display an appearance of bias against me. There are at least 20 separate factual bases for this

Fox Rothschild LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169





appearance of bias and they are all set forth in the reassignment motion that I filed with the Ninth Circuit Court of Appeals. See **Exhibit 14,** Motion for Reassignment attached hereto. However, to give this Court a snapshot into why venue in Montana is not proper as result of this appearance of bias, I will share with this Court just a few the facts which are indicative of an appearance of bias that the Montana bankruptcy court has against me.

(a) One week before Phase I of the trial in AP-14, the Senior Bankruptcy Judge in Montana sent an *ex parte* email to the attorney Andy Patten, attorney for the Yellowstone Club (which was a plaintiff against me in AP-14 seeking over $200 million in damages), directing Mr. Patten to cases that the judge thought would be helpful to the Club in that litigation.

(b) Mr. Patten enjoys a private audience with the sole active bankruptcy judge in Montana regarding his cases. In ex parte email communications between Mr. Patten and the bankruptcy judge's law clerk, Mr. Patten has requested and been given permission to give the bankruptcy judge a "heads up" about new and large bankruptcy cases, and the bankruptcy judge has agreed to keep these communications with Mr. Patten confidential. This gives the appearance of bias in any case in which Mr. Patten represents a party in an adversary proceeding pending before the bankruptcy judge, as is the case in AP-14.

(c) Additionally, before the trial in AP-14, the sole active bankruptcy judge in Montana participated in *ex parte* settlement negotiations between CrossHarbor, the Yellowstone Club, the Unsecured Creditors Committee ("UCC") of the Yellowstone Club and Credit Suisse which resulted in the plan of reorganization that called for repaying the creditors almost exclusively through successful litigation against me in AP-14.

(d) The bankruptcy court conducted a Phase I trial against me in AP-14 <u>only three weeks</u> after the UCC filed a pleading against me in that case seeking

Fox Rothschild LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169





Fox Rothschild LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169

to recover over $200 million from me. Moreover, this Phase I trial commenced only one week after the Debtor filed a similar pleading against me seeking over $200 million from me. This all happened even though the initial complaint in AP-14 was filed against Credit Suisse only 8 weeks before the trial of Phase I commenced. The bankruptcy court later stated that it rushed through the Phase I trial because it had to do so to confirm the plan of reorganization. This overlapping role of the bankruptcy judge as administrator and sole trier of fact in adversary proceedings is precisely involving Mr. Blixseth is precisely why the Ninth Circuit has cautioned bankruptcy judges to be especially solicitous of the appearance of bias. *In re Manoa Finance Co., Inc.*, 781 F.2d 1370, 1373 (9th Cir. 1986) ("To the extent a bankruptcy judge must play both administrative and judicial roles, he is an actor as well as an adjudicator; intimate contact with day-to-day affairs of an estate and close contact with the trustee may make objective appraisal difficult and may create the appearance of partiality. . . . . [W]e suggest that judges sitting in bankruptcy be especially solicitous in maintaining both the appearance and reality of impartiality when adjudicating matters with which they have had close involvement, erring on the side of recusing themselves when appropriate.")

(e) In related bankruptcy proceedings in Montana involving Yellowstone Club World ("YCW"), I reached a settlement of claims with the Trustee for the YCW estate. Before the paperwork for that settlement had been finalized, the bankruptcy judge's law clerk called up the YCW Trustee *ex parte* and urged the YCW Trustee to hurry up and finalize that settlement before I could renege.

(f) In AP-14 the bankruptcy entered a $40 million judgment against based on





a motion to reconsider by the Liquidating Trustee requesting the $40 million figure for the first time. However, the bankruptcy court granted this motion several days before my time to respond to the motion had expired and point out why the $40 million figure was grossly in error. This is just one of several rulings that the bankruptcy court made before my time to respond had expired.

(g) The bankruptcy court entered this $40 million judgment based only on an affidavit of my opposing counsel. The bankruptcy court acknowledged that there was previously no evidence in the record to support a specific monetary judgment amount. Yet, the bankruptcy court has repeatedly advised my counsel that he does not accept affidavits to establish facts.

36. All these facts are exhaustively detailed and supported in the reassignment motion and I invite this Court to review that motion to understand why the appearance of justice cannot be maintained if this case is transferred to Montana.

Signature on following page.

Fox Rothschild LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169





Fox Rothschild LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169

I declare under penalty of perjury of the laws of the United States that the foregoing statements are true and correct.

DATED this 20 day of April 2011.

Timothy L. Blixseth