_____
Honorable Bruce A. Markell
United States Bankruptcy Judge

**Entered on Docket**
**July 10, 2013**
_____

**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

| | | |
|---|---|---|
| In re: | ) | Case No.: BK-S-11-15010-BAM |
| | ) | |
| TIMOTHY L. BLIXSETH, | ) | Chapter 7 |
| | ) | Involuntary |
| Alleged Debtor. | ) | |
| | ) | **Dates:** July 5, 2013 |
| | ) | **Times:** 1:30 p.m. |
| | ) | |

# ORDER GRANTING MOTION TO DISMISS INVOLUNTARY CASE[1]

## I. Introduction

On April 5, 2011 (the "Petition Date"), petitioning creditors Montana Department of Revenue ("Montana"), Idaho State Tax Commission ("Idaho"), and California Franchise Tax Board ("California") (collectively, "Petitioning Creditors") filed an involuntary bankruptcy petition in United States Bankruptcy Court, District of Nevada, against alleged debtor Timothy L. Blixseth ("Blixseth"). (Dkt#1).

---

[1] Unless otherwise specified, all "Section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532; all "FRCP" and "Civil Rule" references are to the Federal Rules of Civil Procedure; all "FRBP" and "Rule" references are to the Federal Rules of Bankruptcy Procedure; all "FRE" references are to the Federal Rules of Evidence.
All references to "Dkt#" are to the ECF number as assigned on the docket for documents filed electronically through CM/ECF in the above referenced bankruptcy case.

1  The petition set forth the amount and nature of the claim held by each entity: Montana, tax claim, $219,258.00; Idaho, tax claim, $1,117,914.00; and California, tax claim, $986,957.95. (Dkt#1). Petitioning Creditors' claims totaled $2,324,129.95. (Dkt#1).

On April 19, 2011, Idaho entered into a settlement agreement with Blixseth whereby Blixseth would pay Idaho $925,000 "in complete settlement of all income taxes, penalty, and interest for [tax years 2005, 2007, 2008]"—the tax years for which Idaho asserted Blixseth owed a tax debt in the amount of $1,117,914.00. (Dkt#32, p. 9) (*see also* Trial Ex. BC). In exchange, Idaho would withdraw its participation as a petitioning creditor in the Bankruptcy *nunc pro tunc*. (*Id.*). Idaho's Withdrawal of Participation Nunc Pro Tunc entered on docket April 20, 2011. (Dkt#20).

On April 20, 2011, California entered into a settlement agreement with Blixseth whereby Blixseth would pay California $992,300.99 (plus $108.75 for each day after April 18, 2011)—the amount California asserted Blixseth owed as a tax debt arising from tax year 2007. (Dkt#32, pp. 4-7) (*see also* Trial Ex. AH). In exchange, California would withdraw its participation as a petitioning creditor in the Bankruptcy *nunc pro tunc*. (*Id.*). California's Withdrawal of Participation entered on docket April 20, 2011. (Dkt#26).

After the court initially dismissed the case for improper venue, the Bankruptcy Appellate Panel found this court to be a proper venue. (*In re Blixseth*, 484 B.R. 690 (B.A.P. 9th Cir. 2012)) (*see also* Dkt#250). On January 7, 2013, the Ninth Circuit Bankruptcy Appellate Panel ("BAP") issued a mandate restoring this Court's jurisdiction over the Bankruptcy. (*See* Docket in BAP Case No. NV-11-1305-PaJuH, Document No. 37).

Before the court are Blixseth's pleadings, the Renewed Motion to Dismiss Involuntary Case (Dkt#261) and the Amended Motion to Dismiss Involuntary Case and Memorandum of Points and Authorities In Support Thereof (Dkt#309) (collectively, the "Motion to Dismiss"). Montana's pleadings, Petitioning Creditor Montana Department of Revenue's Opposition to Mr. Blixseth's Amended Motion to Dismiss (Dkt#437) and Errata to Petitioning Creditor Montana Department of

1 Revenue's Opposition to Mr. Blixseth's Amended Motion to Dismiss (Dkt#438) (collectively, the
2 "Opposition to Motion to Dismiss"), are also before the Court, as is Blixseth's Reply to Petitioning
3 Creditor Montana Department of Revenue's Opposition to Amended Motion to Dismiss ("Reply to
4 Motion to Dismiss") (Dkt#470).

5     On May 8, 2013, the Yellowstone Club Liquidating Trust ("YCLT") submitted its Notice of
6 Joinder in Involuntary Petition ("YCLT Joinder"). (Dkt#359). Blixseth's counsel submitted its
7 Memorandum Re: Yellowstone Club Liquidating Trust Notice of Joinder (Dkt#402) and its *Amended*
8 Memorandum Re: Yellowstone Club Liquidating Trust Notice of Joinder [sic] (Dkt#404); both
9 documents entered on docket May 20, 2013 (collectively, the "Memoranda"). Counsel for Blixseth
10 later submitted its Opposition to Yellowstone Club Liquidating Trust's Notice of Joinder (Dkt#453),
11 entered on docket June 3, 2013, as well as its Errata to Opposition to Yellowstone Club Liquidating
12 Trust's Notice of Joinder (Dkt#459), which also entered on docket June 3, 2013 (collectively with the
13 Memoranda, the "Opposition to YCLT Joinder"). YCLT's Memorandum in Support of Yellowstone
14 Club Liquidating Trust's Joinder Under Section 303(c) of the Bankruptcy Code ("Memorandum in
15 Support of Joinder") (Dkt#467), entered on docket June 5, 2013.

16     Trial on the matters set forth in the Motion to Dismiss, the Opposition to Motion to Dismiss,
17 the Reply to Motion to Dismiss, the YCLT Joinder, the Opposition to YCLT Joinder, and the
18 Memorandum in Support of Joinder took place on June 13, 2013, and June 14, 2013 ("Trial"). The
19 Court's Omnibus Rulings on Evidentiary Objections there presented then followed. (Dkt#512).
20 Closing arguments for Trial took place on July 5, 2013, with YCLT[2] and parties Blixseth[3] and

---

[2] *Post-trial Memorandum In Support of the Involuntary Petition Under Section 303 of the Bankruptcy Code* (Dkt#511).

[3] *Post-trial Closing Brief in Support of Amended Motion to Dismiss* (Dkt#515).

3

Montana[4] having submitted post-trial briefs in advance of their appearances on July fifth. Against this background, the court grants the motion to dismiss for the reasons stated in this order.

Blixseth brought the Motion to Dismiss under Civil Rule 12(b)(6), incorporated by Rule 1011(c). All parties immediately conducted discovery and consented to a two-day hearing on the Motion to Dismiss, at which time testimonial and documentary evidence was taken (the same "Trial"). This converted the Motion to Dismiss under Civil Rule 12(b)(6) into a partial summary judgment motion (the "Motion"). (Civil Rule 12(d)). As all parties had "a reasonable opportunity to present all the material that is pertinent to the motion," the Court has considered this Motion under Civil Rule 56's standard that Blixseth must "show[] that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law." (Civil Rule 56(a), incorporated by Rules 1018 and 7056) (*see also Focus Media, Inc. v. Nat'l Broad. Co. (In re Focus Media, Inc.)*, 378 F.3d 916 (9th Cir. 2004) (determining qualifications of petitioning creditors on summary judgment)).

## II. Merits

Blixseth's argument is relatively simple. He claims that the relevant standard requires three qualifying petitioning creditors, and that of the four candidates, none qualify. As a matter of law, therefore, he contends that there is no material dispute *of fact* (albeit he acknowledges that there are significant disputes as to the law), and he is thus entitled to judgment as a matter of law.

The legal standard for Blixseth's Motion to Dismiss is relatively easy to articulate. Section 303(b) requires that a qualifying petitioning creditor must be "a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount . . . ." 11 U.S.C. § 303(b)(1). There must be at least three petitioning creditors holding such qualifying claims unless "there are fewer than 12 such holders, excluding . . . any transferee of a transfer that is voidable . . . ." *Id.* at § 303(b)(2). In this latter case, there need be only one qualified petitioning

---

[4] *Petitioning Creditor Montana Department of Revenue's Closing Arguments in the Evidentiary Hearing on Mr. Blixseth's Amended Motion to Dismiss (Dkt. #309)* (Dkt#516).

4

creditor. *Id.* Regardless of the required number of petitioning creditors, however, the aggregate amount of claims held by all petitioning creditors not secured by the debtor's property–generally referred to as unsecured claims–must total at least $14,475.[5] *Id.*

No party contests that the Petitioning Creditors' collectively hold unsecured claims that exceed the minimum amount. No party seriously contests that the Petitioning Creditors claims are contingent; that is, dependent on some third-party or external action other than litigation between the parties. What is contested is whether Blixseth has more than eleven creditors, and whether the claims of the Petitioning Creditors are "the subject of a bona fide dispute as to liability or amount."

*A. Did Blixseth Have More than Eleven Creditors?*

A critical point is the number of the alleged debtor's creditors. If eleven or less, there need be only one qualifying petitioning creditor. If twelve or more, there needs to be three. Normally, if the number of creditors is contested, the alleged debtor files an answer to the petition, and "[i]f the answer to an involuntary petition filed by fewer than three creditors avers the existence of 12 or more creditors, the debtor shall file with the answer a list of all creditors with their addresses . . . ." (Rule 1003(b)). Here, however, Blixseth did not file an answer, taking advantage of Rule 1011 incorporation of Civil Rule 12, filing a motion to dismiss before filing an answer. Thus, this Court previously ruled that Rule 1003(b) did not apply–thereby obviating any obligation to file such a statement.

What Blixseth did do, however, was to respond in discovery with a non-exhaustive list of 18 creditors he claimed he had on the Petition Date. Montana, on behalf of the Petitioning Creditors, then

---

[5] Although the threshold amount listed in 11 U.S.C. § 303(b)(1) is $10,000, Congress provided that this threshold is to be adjusted for inflation at three year intervals. *See* 11 U.S.C. § 104. The requirement in effect when this proceeding commenced was $14,425. *See Revision of Certain Dollar Amounts in the Bankruptcy Code Prescribed Under Section 104(a) of the Code*, 75 Fed. Re. 8747 (Feb. 10, 2010). It is now $15,325. *Revision of Certain Dollar Amounts in the Bankruptcy Code Prescribed Under Section 104(a) of the Code*, 78 Fed. Re. 12,089 (Feb. 21, 2013).

5

engaged in extensive cross examination on this issue. Despite this, the Court is unpersuaded that more than six of these creditors should be disqualified.

As a starting point, it is the Petitioning Creditors' burden to show that they have met all of the requirements of Section 303(b). This includes showing that they collectively have a sufficient number of petitioning creditors.

The creditors listed by Blixseth were:

Credit Card
    Neiman Marcus
    US Bank
Utilities
    City of Medina
    Puget Sound Energy
    Comcast
    Qwest
Other Unsecured Creditors
    Medina Gardening and Landscape, Inc.
    Big Horn Golf Club
    Lewis Cellars
    TransAmerica Life Insurance
    ADT
    Prudential Life Insurance
    Chubb Casualty
Professionals
    Mack, Roberts & Co.
    Mike Flynn
    Stillman & Associates
    Rosen Law
    Hagen & O'Connell

At the hearing, Blixseth reiterated his discovery responses and authenticated documents related to each of these creditors. In many cases, the documents provided indicated balances due and owing before April 5. Indeed, in some cases–Neiman Marcus, and most of the utilities–it is likely that the bills were paid before the Petition Date.

But that is not fatal. The bills themselves were evidence of ongoing, recurring debts, such as cable and electrical service, and it begs common sense to believe that these entities did not provide services after payment, thus possessing accrued but unbilled balances on the Petition Date. When

there is a periodic, recurring debt that the alleged debtor does not dispute, evidence of a recent liquidation of that debt such as a bill or invoice, and no evidence that such relationship terminated after the petition date for nonpayment, there is a debt for purposes of Section 303(b)(2). *See* 2 COLLIER ON BANKRUPTCY ¶ 303.14[4] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.). Indeed, as to Neiman Marcus, Puget Sound Energy, Comcast, and Qwest, the Court so finds.

The Petitioning Creditors also note that Blixseth's habit of paying early his US Bank credit card–which seemed to average more than $30,000 per month–meant that that credit card bill had been paid as of April 5. Blixseth denied this, but even if this bill had been paid, it is reasonable to assume, from the sheer amount of monthly charges, that some new charges would have been incurred and were thus owing as of the Petition Date.[6]

Blixseth's assertion of debts owing to Big Horn Golf Club, TransAmerica Life Insurance, Medina Gardening and Landscape, Inc., Prudential Life Insurance, Chubb Casualty (and its various insurers), and ADT are similar. Each is a periodic, recurring debt that Blixseth testified was owed, undisputed and generally paid in the ordinary course. Again, if only the accrual of debt existed on April 5, it was still debt which counts for Section 303(b)(2).

This leaves the five professionals. Again, Blixseth authenticated these debts to the court's satisfaction. He testified and was subject to cross examination as to the existence and validity of these debts, and the court credits his testimony.[7] When combined with the other recurring debts, this means

---

[6] This same logic does not, however, apply to the debt to Lewis Cellars, a regular creditor of Blixseth's, but by no means as regular and periodic as Blixseth's utility providers or his credit card companies. So, too, as to the debt owed to the City of Medina. Neither of these debts have the regularity of occurrence that would justify finding that there was an accrual of debts to these entities as of the Petition Date. As a consequence, the court finds that any debts owed Lewis Cellars or the City of Medina do not count for purposes of Section 303(b)(2).

[7] The Petitioning Creditors cry that they stonewalled as to further information on these debts and didn't follow up before the Trial because they ran out of time. (*See* note 2 in Closing Arguments). Hogwash. Although the Motion to Dismiss was held on a somewhat accelerated schedule, none of the Petitioning Creditors ever brought a motion to compel, or ever made a formal

Blixseth has established that there were at least 16 creditors as of April 5, 2011. And this is before the Court considers the claims of the eight members of Yellowstone Club World with whom Blixseth had settled some outstanding claims ("YCW Members"). The YCW Members had filed a request for notice in this case–indicating that they still consider themselves creditors–and the YCW Members provided evidence from which it could be inferred that Blixseth had direct, although shared, liability to them. In any event, the Petitioning Creditors failed to establish that Blixseth had less than twelve creditors as of the Petition Date.

The Petitioning Creditors make much of the fact that many of the creditors listed by Blixseth received payments after the Petition Date. Citing *In re Teledata Corp.*, 12 B.R. 879 (Bankr. D. Nev. 1981) (George, J.), the Petitioning Creditors contend that each of those creditors receiving payment on a prepetition claim are ineligible because Section 303(b)(2) renders ineligible those creditors whose post-petition transfer would be avoidable under Section 549. The burden of establishing avoidability, however, rests on the Petitioning Creditors. While some of the entities may have received avoidable transfers, the Court is left to guess what was paid, from what source, and for what consideration. It could be, for example, that payment came from non-estate property such as postpetition earnings, or it could have come from an affiliated entity. In such a case, without a transfer of estate property, there could be no Section 549 avoidance. *See* COLLIER, *supra*, at ¶ 303.14[3]. Alternatively, payments could have been structured in such a way that necessary services, such as utilities, would continue to be provided post-petition, thereby providing a Section 549(b) defense. Without more or credible evidence of avoidability, the Court does not disqualify any of the 16 creditors selected above from the count required by Section 303(b)(2).

---

objection at the pretrial of these matters. Even if the court did not find that these five professionals were each creditors on the petition date, which it does, the inaction of the Petitioning Creditors estops them from complaining now about opportunities to develop evidence that they consciously elected not to pursue.

8

As such, any involuntary petition against Blixseth must have had at least three petitioning creditors.

*B. Standard for Qualifying Petitioning Creditors*

Section 303(b)(1) requires that each qualifying petitioning creditor must hold a claim that is not "the subject of a bona fide dispute as to liability or amount." As to the standard for whether a dispute is bona fide, the Ninth Circuit is clear. In *Liberty Tool & Manufacturing v. Vortex Fishing Systems, Inc. (In re Vortex Fishing Systems, Inc.)*, 277 F.3d 1057, 1064-65 (9th Cir. 2001), the court stated:

> [A]ll other circuit courts that have considered the question have adopted some variation of [*In re Busick*'s (831 F.2d 745 (7th Cir. 1987))] "objective test," first set out in *In re Lough*, 57 B.R. 993, 996-97 (Bkrtcy. E.D. Mich. 1986) ("[I]f there is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts, then the petition must be dismissed.").
>
> . . .
>
> We join our sister circuits in adopting the objective test for disputes regarding liability or amount.

But there is a wrinkle here. Section 303(b)(1) was amended in 2005 to add the words "as to liability or amount." This raises the question of whether, as was the prior practice, petitioning creditors may still qualify as such if only part of their claim is dispute, in essence relying on that part of the claim which, for various reasons is not disputed.

The question of whether any part of a disputed claim could serve as a claim justifying an involuntary bankruptcy has long been a subject of discussion. In 1984, Congress attempted to address this issue definitively by amending Section 303(b) to specifically address this issue. The Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333, amended subsections (b)(1) and (h)(1) of section 303 to add the words "or the subject of a bona fide dispute" to further condition the types of claims that could qualify for purposes of an involuntary petition.

By narrowing the type of qualifying claim, Congress recognized and remedied the problem of creditors holding disputed claims being able to force a debtor into bankruptcy. (*See* 130 Cong. Rec. S. 7618 (daily ed. June 19, 1984) (Floor Statement of Senator Max Baucus) ("I believe this amendment although a simply [sic] one is necessary to protect the rights of debtors and to prevent misuse of the bankruptcy system as a tool of coercion.")).

The new language, however, did not specify the kind of bona fide dispute contemplated by Congress. In other words, the new language did not indicate expressly whether a bona fide dispute regarding the amount of a debt was sufficient to disqualify a petitioner's claim, when the debtor did not dispute that there was *some* liability. *See* COLLIER, *supra*, at ¶ 303.11[2] ("There was considerable question before the 2005 amendments whether disputes as to amount alone were enough to make a petitioning creditor's claim invalid for purposes of filing an involuntary case.").

The Ninth Circuit Court of Appeals and other courts answered that question by holding that a dispute as to amount *could* disqualify a claim, but only if the dispute would reduce the total amount of the petitioners' claims below the required dollar amount. *Focus Media, Inc. v. Nat'l Broadcasting Co. Inc. (In re Focus Media, Inc.)*, 378 F.3d 916, 924-25 (9th Cir. 2004); *Chicago Title Insurance Co. v. Seko Investment, Inc. (In re Seko Investment, Inc.)*, 156 F.3d 1005, 1008 (9th Cir. 1998).

In *In re Focus Media, Inc.*, seven petitioning creditors forced the debtor into an involuntary bankruptcy. (378 F.3d at 921). Shortly thereafter, the bankruptcy court granted the petitioning creditors' motion for summary judgment on the involuntary petition, finding no genuine issue for trial as to the petitioners' showing that the claims were not subject to a bona fide dispute, among other issues. (*Id.* at 921-22). On appeal, Focus Media argued that the petitioning creditors' claims were subject to bona fide dispute because they were subject to potential adjustments that could not then be ascertained with any certitude. (*Id.* at 924-25). Focus Media further argued that "any uncertainty or dispute as to the amount of a debt is a bona fide dispute unless the dispute arises from a transaction that is wholly separate from the debt itself." (*Id.* at 925). The Ninth Circuit rejected these arguments,

10

concluding that "even assuming there was an actual, non-theoretical dispute as to the precise amounts Focus owed the petitioning creditors . . . such a dispute is relevant only if it takes the total debt below [the statutory threshold]." (*Id.* at 925-26).

In response to *Focus Media* and cases like it, in 2005 Congress again amended Section 303(b). In particular, Congress added the words "as to liability or amount" to subsections (b)(1) and (h)(l). (Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, enacted April 20, 2005 ("BAPCPA")). Accordingly, as of April 20, 2005,[8] Section 303(b)(1) provided as follows:

> (b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $10,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

11 U.S.C. § 303(b) (2006) (emphasis added). With the exception of an adjustment to the threshold dollar amount, this was the version of section 303(b) in effect on April 5, 2011, the Petition Date. *See* 11 U.S.C. § 303(b).

In light of *Focus Media* and similar cases that preceded BAPCPA, courts have interpreted the 2005 amendment to express the intent of Congress that a bona fide dispute as to *any* amount is sufficient under Section 303(b) to disqualify the claim of a petitioning creditor. For example, in *In re Excavation, Etc., LLC*, 2009 Bankr. LEXIS 1905 (Bankr. D. Or. June 24, 2009), one of three petitioning creditors argued that as long as the "undisputed portion" of its claim was above the statutory threshold, a dispute regarding the amount of its claims was insufficient to disqualify the

---

[8] Most of the provisions of BAPCPA were made effective as of October 17, 2005. The changes to section 303(b), however, were made effective immediately on enactment on April 20, 2005.

11

creditors under Section 303(b). The court rejected this argument, holding that the BAPCPA amendments to Section 303(b) overruled *Focus Media*:

> There is also a bona fide dispute with respect to Hilton Oil Company, one of the three original petitioners. The parties acknowledge that their understanding of the amount owed by Hilton are tens of thousands of dollars apart. Hilton, relying on *In Focus Media*, 378 F.3d 916, 926 (9th Cir. 2004), argues that this doesn't matter, because at least part of the debt is acknowledged by the alleged debtor. *In Focus*, following *In re Seko Investment, Inc.*, 156 F.3d 1005 (9th Cir. 1998), provides that a "dispute as to the amount of the claim gives rise to a bona fide dispute only when (1) it does not arise from a wholly separate transaction, and (2) 'netting out the claims of debtors' could take the petitioning creditors below the amount threshold of § 303."
> The BAPCPA amendments of 2005 added to § 303 a provision that a claim would be excluded if subject to a bona fide dispute as to liability or amount. This overrules *Seko* and *In Focus*. If the *In Focus* rule were to remain in effect, the "and amount" language would be superfluous, since under *In Focus* the only dispute as to amount is a dispute over the entire claim, or at least a big enough dispute that netting out would take the claim below the monetary threshold. It is a basic canon of statutory construction that language be given its full effect. *See*, *e.g.*, *U.S. v. Church of Scientology Western U.S.*, 973 F.2d 715, 717 (9th Cir. 1992); *U.S. v. Allen*, 341 F.3d 870, 878 (9th Cir. 2003). That would not occur if *In Focus* is applied. Because the debt of Hilton Oil Company is subject to a bona fide dispute as to amount, Hilton Oil Company is not a valid petitioning creditor.

(*Id.* at \*3-\*5; *see also In re Euro-American Lodging Corp.*, 357 B.R. 700, 712, n.8 (Bankr. S.D.N.Y. 2007) (prior to 2005 Amendments, a dispute as to amount gave rise to a bona fide dispute when it, among other things, reduced the petitioning creditors' claim below the monetary threshold of Section 303(b); the 2005 Amendments "presumably eliminated" that part of the test); *Reg'l Anesthesia Assocs. PC v. PHN Physician Servs. (In re Reg'l Anesthesia Assocs. PC)*, 360 B.R. 466, 470 (Bankr. W.D. Pa. 2007) ("As a result of the amendment, any dispute regarding the amount that arises from the same transaction and is directly related to the underlying claim should render the claim subject to a bona fide dispute.") (citation omitted)).

*In re Hentges*, 351 B.R. 758 (Bankr. N.D. Okla. 2006) reached the same conclusion. After the 2005 Amendments had become effective, three petitioning creditors filed an involuntary petition

12

against the alleged debtor, Hentges. (*Id.* at 762). Hentges admitted liability with respect to two of the three petitioning creditors, but denied liability with respect to the third creditor, Tulsa National Bank ("Tulsa"). *Id.* In the involuntary petition, Tulsa had asserted a claim against the debtor for $39,253.15 based on a note and guaranty. (*Id.* at 763). Following a trial on the merits of the petition, the court determined that the amount of Tulsa's claim was in bona fide dispute. (*Id.*). Although there was no bona fide dispute that Hentges owed $29,400.00 as guarantor of the promissory note, Tulsa failed to demonstrate its entitlement to an additional $8,500 in attorney fees and expenses that were included in its claim. (*Id.*). Based on this dispute, and notwithstanding the fact that the "undisputed portion" of the claim was over the minimum amount established by Section 303(b)(1), the court concluded that Tulsa did not qualify as a petitioning creditor, and dismissed the involuntary petition. (*Id.* at 763).[9]

Against this background, and given the history and purposes of Section 303(b) and the 2005 changes to it, Section 303(b)(1) should now be construed to disqualify petitioning claims based on any bona fide dispute as to amount, even if some "portion" of the claim is undisputed. This interpretation not only is consistent with the legislative history of Section 303(b), but with the legislative history of the previous Bankruptcy Act. In 1962, Congress deleted language related to the requirement of liquidated claims because it was concerned that this language "foreclose[d] a creditor with a large unliquidated claim . . . from joining in a petition, although it can be made abundantly clear that his claim exceeds the statutory minimum. Indeed, the bankrupt, by urging counterclaims against the apparently liquidated claims of the petitioning creditors, may remove them from the category of claims 'liquidated as to amount' and procure a dismissal of the petition." *See* H.R. Rep. No. 1208, 87th Cong., 1st Sess. § 7 (1961). The reinsertion in 2005 of language similar to that which was deleted in 1962

---

[9] Not every court has construed BAPCPA as changing the "bona fide dispute" analysis. *See In re DemirCo Holdings Inc.*, 2006 Bankr. LEXIS 1131, *8-*10 (Bankr. C.D. Ill. June 9, 2006) (even after 2005 Amendments, a bona fide dispute as to amount only disqualifies a petitioning creditor if it has the potential to reduce total amount of petitioning claims below the statutory threshold).

13

must be understood to mean that Congress intended to disqualify the very claims that Congress sought to qualify in 1962 for purposes of an involuntary petition.

*C. Claims of California and Idaho*

After the involuntary petition was filed, both California and Idaho independently agreed to settle the amounts owed them. Although payment of debts owed to petitioning creditors do not disqualify them for counting purposes under Section 303(b)(1), these settlements do call into question as to whether the debts so settled were subject to a bona fide dispute.

The facts clearly show that they do. Idaho's settlement reflected a discount from the claimed liability. The willingness to take a discount in light of Blixseth's denials of liability provides strong evidence that a dispute existed; otherwise, why settle? Montana contends that the settlement was for nuisance value and thus should not provide evidence of a dispute. The fact remains, however, that a petitioning creditor took a discounted settlement when it had previously filed an involuntary petition, and this court is in no position–because there was no evidence presented in support–to determine how much of the discount was truly nuisance and how much was a calculated move designed to fend off liability disputes down the road.

California presents a somewhat different problem. Its settlement agreement does not discount the amount it had contended it was owed. But its settlement agreement does acknowledge that Blixseth disputed the claim–again, strong evidence of a dispute: why sign an agreement that contains known lies? Indeed, the evidence of the dispute was necessary to effect the settlement. A debt cannot be "settled" for its full amount because there is no consideration exchanged. *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 74, com. c (1981) ("Payment of an obligation which is liquidated and undisputed is not consideration for a promise to surrender an unliquidated claim which is wholly distinct."). California apparently wished to avoid potential liability under Section 303(i). To obtain an enforceable promise from Blixseth to that effect, it had to acknowledge a good faith dispute, which is what it relayed in the settlement agreement's Recital. To suggest otherwise, as Montana does, is to

14

suggest that California settled in bad faith–creating a bogus dispute to validate a shield against liability–and there is no evidence of that level of bad faith. As a consequence, by California's own actions, its claim was subject to a bona fide dispute.

The disqualification of Idaho and California means that the number of petitioning creditors is insufficient to sustain the involuntary petition. To avoid confusion should there be an appeal and any remand, the court will also assess YCLT's and Montana's qualifications.

*D. YCLT*

YCLT claims qualifying petitioning creditor status on the basis of an unstayed judgment arising from the bankruptcy court in the District of Montana. It has cross-appealed that judgment, seeking a judgment approximately four times the amount of the original judgment.

YCLT is a joining petitioning creditor under Section 303(c). As such, it claims that the requirements of undisputed debt do not apply to it. Its argument is based on the language of Section 303(c), which states:

> After the filing of a petition under this section but before the case is dismissed or relief is ordered, a creditor holding an unsecured claim that is not contingent, other than a creditor filing under subsection (b) of this section, may join in the petition with the same effect as if such joining creditor were a petitioning creditor under subsection (b) of this section.

This section does not contain restrictions on the type of debt that may join. Under its text, creditors with contingent claims or disputed claims may join the petition and "with the same effect as if such joining creditor were a petitioning creditor."

This seemingly anomaly has existed for many years with respect to contingent creditors–they were never excluded from Section 303(c)–but since 2005 this anomaly has been extended to debts disputed as to liability and amount as well. COLLIER (*supra*, at ¶ 303.19[1]) states that the disputed test should apply to Section 303(c) creditors. There exists some case authority for this proposition.

(*In re Kujawa*, 112 B.R. 968 (Bankr. E.D. Mo. 1990) (disputed claim); *cf. In re Braten*, 86 B.R. 340, 343 (Bankr. S.D.N.Y. 1988) (contingent claim)).

But these cases predate the 2005 amendments. When a known anomaly is not addressed in subsequent legislation, the presumption is that Congress did not intend to change it. *Cf. Zuni Public School Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81 (2007) (in context of agency interpretations); *Chisom v. Roemer*, 501 U.S. 380 (1991) (same). As a consequence, since YCLT's claim is not contingent, it may join the petition "with the same effect as if such joining creditor were a petitioning creditor."

*E. Montana*

Montana contends its has over $50 million in claims against Blixseth. Most of these are disputed, and disputed intensely. Montana's claim here (termed "Audit Issue 4" by the parties), however, amounts to approximately $219,000 and arises from the denial of a deduction taken by one of Blixseth's entities–one result of Montana's audit of Blixseth's income in tax years 2002 - 2006 (the "Audit"). That denial effectively increased the entity's income by approximately $1.5 million for tax year 2004. With respect to tax year 2004, however, Blixseth is hotly contesting other aspects of the Audit. This raises the issue of what Montana's claim is, and whether it is not truly subject to bona fide dispute as to liability or amount.

For a natural person, a taxing entity generally has but one claim for each calendar year of a taxpayer's life. As stated in *In re Blue Coal Corp.*, 166 B.R. 816 (Bankr. M.D. Pa. 1993):

> The relationship of taxpayer to tax recipient is such that the creditor-debtor relationship accrues on an annual basis rather than on some sort of open account. Each tax year represents a separate claim. 'Income taxes are levied on an annual basis. Each year is the origin of a new liability and of a separate cause of action.'

*Id*. at 822 (quoting *In re Hartman Material Handling Systems, Inc.*, 141 B.R. 802, 810 (Bankr. S.D.N.Y. 1992), in turn citing *Commissioner v. Sunnen*, 333 U.S. 591 (1948)). *See also* MONT. CODE ANN. § 15-30-2604 (2013); *cf* MONT. CODE ANN. § 15-30-2629 (2013). That is no different here.

With the other audit issues still live, it is beyond cavil that Montana's claim for tax debt arising from tax year 2004 is disputed. Montana has not shown sufficiently that it was either authorized to create a separate liability or claim related to Audit Issue 4 – such as a jeopardy assessment – or that, if authorized, it took the proper steps to separately create and present its claim. And that was its burden.

Nevertheless, Montana contends that the asserted tax debt arising from Audit Issue 4 is beyond dispute. It is Montana's belief that Blixseth has conceded he owes at least the amount in Audit Issue 4. The problem with this view is twofold: First, Blixseth has not conceded a minimum amount of tax due and owing for tax year 2004 (even if he conceded liability related to the disallowance of the deduction that gave rise to Audit Issue 4, he alleges other changes to his income and deductions for tax year 2004). Second, even if Blixseth had, this court's analysis, *supra*, regarding the implicit overruling of *Focus Media* by the 2005 BAPCPA legislation demonstrates that, so long as part of a claim is disputed, the creditor may not qualify as a petitioning creditor for purposes of Section 303(b).

### III. Conclusion

This court finds that Blixseth had at least 12 creditors who qualify under Section 303(b)(2). Consequently, the involuntary petition required three or more petitioning creditors. The involuntary petition does not have the required amount. Therefore, the Motion is **GRANTED**, and the Bankruptcy is **DISMISSED**.

Copies sent to:

CM/ECF ELECTRONIC NOTICING

BNC MAILING MATRIX

# # #