# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

State of Montana Department of Revenue,

    Appellant/cross-appellee

v.

Timothy L. Blixseth,

    Appellee/cross-appellant

2:13-cv-01324-JAD

**Decision Affirming Bankruptcy Court's Order Dismissing Involuntary Bankruptcy Case and Granting Motion for Leave to File Supplemental Authorities**

[ECF No. 85]

*11-15010 MKN*

*APL 13-27   APL 18-29*

    This appeal and cross-appeal challenge the bankruptcy court's decision to dismiss the involuntary bankruptcy case that taxing authorities for the States of Montana, California, and Idaho filed against Timothy Blixseth. When Blixseth settled with the California and Idaho authorities a few weeks after the petition was filed, those creditors withdrew their support for the petition nunc pro tunc as of its filing date, and they took no further part in the bankruptcy case. Another creditor then joined in the petition. Blixseth moved to dismiss the case, arguing that the involuntary-bankruptcy standard was not met because three qualified creditors were needed to maintain the case, but none of the four contenders fit the bill.

    The bankruptcy court allowed the parties to engage in expedited discovery and set the motion for an evidentiary hearing. After a two-day evidentiary hearing, the bankruptcy court converted the dismissal motion into one for summary judgment and dismissed the case. It found that Blixseth had met his burden to show that he had at least 12 creditors on the petition date, but that the petitioning creditors had not met their burden to show that those creditors were not qualified, so three qualified creditors were required to maintain the case against Blixseth. It held that, as amended in 2005, the involuntary bankruptcy statute now disqualifies petitioning creditors whose claims are the subject of any bona fide dispute as to amount, and it found that the petitioning creditors were not qualified because their claims were the subject of bona fide disputes. And, finally, the bankruptcy court concluded that the statute does not require the joining creditor's claim to be an undisputed debt.

Montana appeals all of the bankruptcy court's rulings except its determination that the joining creditor's claim was not required to be an undisputed debt.[1]  Blixseth cross-appeals only the determination about the joining creditor's claim.[2]  I have jurisdiction to consider the appeal and cross-appeal under 28 U.S.C. § 158(a), and I affirm.

## Background

The State of Montana Department of Revenue (Montana), California Franchise Tax Board (California), and Idaho State Tax Commission (Idaho) filed an involuntary bankruptcy petition against Timothy Blixseth on April 5, 2011.[3]  Fifteen days later, Idaho and California each filed notice that they were withdrawing their participation in the petition nunc pro tunc as of the date it was filed due to settlements that they reached with Blixseth.[4]  The trustee of the Yellowstone Club Liquidating Trust (Yellowstone) then joined the involuntary petition,[5] and Blixseth moved to dismiss the involuntary case, arguing that the petition did not meet 11 U.S.C. § 303(b)'s requirements because it lacked the support of three creditors who held noncontingent, undisputed claims against him.[6]

The bankruptcy court allowed the parties to conduct discovery on the dismissal issues and held a two-day evidentiary hearing on the motion.[7]  It then issued a written decision that

---

[1] ECF No. 57.

[2] ECF No. 63.

[3] Montana's Excerpts of Record (MER) at 39–42.  These excerpts are located at ECF Nos. 58–58-13, but because they contain overlapping (and thus illegible) docket stamps, I refer to the bates numbers.

[4] MER 43–48 (notices of withdrawal), 821–24 (California settlement agreement), 1030–31 (Idaho settlement agreement).

[5] MER 49–58.

[6] MER 59–79.  Blixseth filed three dismissal motions, *see* MER 1667 (motion), MER 1722 (renewed motion), MER 1734 (amended motion), however, the dismissal order concerns only the latter two.  *See* MER 2.

[7] MER 3–4.

1 converted the dismissal motion into one for partial summary judgment, granted the motion, and

2 dismissed the involuntary bankruptcy case.[8] The appeal and cross-appeal timely followed.[9]

### Discussion

4      The bankruptcy code permits qualified creditors to file an involuntary bankruptcy case

5 against an individual under certain conditions.[10] To qualify as a petitioning creditor under the

6 code, an entity must hold a claim against an individual "that is not contingent as to liability or the

7 subject of a bona fide dispute as to liability or amount . . . ."[11] The petitioning creditors'

8 "noncontingent, undisputed claims" must aggregate at least $14,425 more than the value of any

9 lien on property of the debtor securing the holders' claims.[12] If the involuntary debtor has fewer

10 than 12 qualified creditors (excluding employees, insiders, and any transferee of any transfer that

11 is voidable under 11 U.S.C. §§ 544, 545, 547, 548, 549, or 724(a)), then an involuntary case can

12 be commenced by as few as one qualifying creditor.[13] Otherwise, at least three qualifying

13 creditors are needed to maintain an involuntary case against the individual.[14]

14      The parties challenge every aspect of the bankruptcy court's decision to dismiss the

15 involuntary bankruptcy case. I begin with the question of how many qualified creditors were

---

17 [8] MER 1–17.

18 [9] *Compare* Fed. R. Bankr. P. 8002(a) (providing 14-day window to file a notice of appeal, and 14 days after a timely filed of notice of appeal for any other party to file a notice of appeal) *with* MER 1787 at ECF No. 528 (dismissal order entered on July 10, 2013) *and* MER 1789 at ECF No. 541 (Montana's notice of appeal filed on July 22, 2013) *and* MER 1794–95 at ECF No. 566 (Blixseth's notice of cross-appeal filed on Aug. 5, 2013).

22 [10] *See generally* 11 U.S.C. § 303 (2012). I largely cite to the version of the statute that was effective from Dec. 22, 2010, to March 31, 2013.

23 [11] *Id.* at § 303(b)(1).

24 [12] *Id.* The statutory threshold was $14,425 when the involuntary petition was filed in 2011, but has since increased to $15,775. *Compare* 11 U.S.C. § 303(b)(1) (2016) *with* 11 U.S.C. § 303(b)(1) (2012); 11 U.S.C. § 104 (2016).

27 [13] 11 U.S.C. § 303(b)(2).

28 [14] *Id.* at § 303(b)(1).

1  needed to maintain the case against Blixseth. I find that the bankruptcy court applied the correct

2  standard to decide this question and not clearly err in its conclusion, so I affirm its decision that

3  three qualified creditors were needed to maintain the case against Blixseth. I then consider

4  whether there was a sufficient number of qualified creditors to maintain the involuntary case. I

5  find that Montana and California are not qualified because their claims were the subject of bona

6  fide disputes. Because that leaves only one petitioning creditor and a joining creditor, and they

7  could not possibly fill the three-qualified-creditors requirement, I disregard the parties' remaining

8  arguments as moot and affirm the bankruptcy court's decision to dismiss the involuntary

9  bankruptcy case.

10  **A.      How many qualified creditors are needed to maintain the case against Blixseth?**

11         If an individual has 12 or more creditors whose claims are not contingent as to liability or

12  the subject of a bona fide dispute as to liability or amount—referred to as "qualified" creditors in

13  the jurisprudence—then the support of three such creditors is needed to maintain an involuntary

14  bankruptcy case against that individual.[15] But if an individual has 11 or fewer qualified creditors,

15  then an involuntary case can be maintained against him by a single qualified creditor.[16]

16         The bankruptcy court determined that three qualified creditors were needed to maintain

17  the case against Blixseth because he had met his burden to show that he had at least 12 creditors

18  on the petition date, but that the petitioning creditors had failed to meet their burden to show that

19  any of those creditors should be disqualified.[17] Montana argues that the bankruptcy court got the

20  burden of proof wrong and erred in finding that Blixseth had met his burden but that the

21  petitioning creditors had not.[18]

22

23

24  ───────────────

25  [15] *Id.*

26  [16] *Id.* at § 303(b)(2).

27  [17] MER 8–9.

28  [18] ECF No. 57 at 49–57.

Reviewing courts "apply de novo review to questions of law, such as the question of whether the . . . [bankruptcy] court applied the correct burden of proof."[19] "Whether that burden of proof has been met, however, is reviewed for clear error."[20] Clear error is a "deferential" standard that "does not entitle [me] to overturn a finding 'simply because [I am] convinced that [I] would have decided the case differently.'"[21] This standard requires me to have "a definite and firm conviction that a mistake has been made."[22]

### 1. *Burden of proof*

Montana argues that the burden of proof on the number of qualified creditors needed to maintain an involuntary bankruptcy case is a shifting one: the debtor has the initial burden to "prove up the existence of 12 or more creditors" and, once met, the burden shifts "to the petitioning creditors to show 'that the [d]ebtor has fewer than . . . 12 . . . *bona fide* creditors.'"[23] According to Montana, the bankruptcy court erroneously placed the entire burden on the petitioning creditors. I disagree.

The bankruptcy court began by noting that petitioning creditors have the "burden to show that they have met all the requirements of Section 303(b). This includes showing that they collectively have a sufficient number of petitioning creditors."[24] It next analyzed whether Blixseth, the moving party, had proffered evidence showing that he had 12 or more creditors on the petition date.[25] It stated that Federal Rule of Bankruptcy Procedure 1003(b) requires that, if a

---

[19] *Washington Mutual, Inc. v. United States*, 856 F.3d 711, 721 (9th Cir. 2017).

[20] *Id.*

[21] *Glossip v. Gross*, ___ U.S. ___, 135 S.Ct. 2726, 2739 (2015) (alterations changed to reflect singular subject) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)).

[22] *Washington Mutual, Inc.*, 856 F.3d at 721 (quotation marks and quoted reference omitted).

[23] ECF No. 57 at 50–51 (quoting *In re Global Waste*, 207 B.R. 542, 544 (Bankr. N.D. Oh. 1997)).

[24] MER 6.

[25] MER 5–6.

debtor's "answer to an involuntary petition filed by fewer than three creditors avers the existence of 12 or more creditors," then "the debtor shall file with the answer a list of all creditors with their addresses . . . ."[26] But, the court reasoned, FRBP 1003(b) did not apply because Blixseth filed a motion to dismiss the involuntary petition, not an answer.[27] The court then explained that Blixseth had responded "in discovery with a non-exhaustive list of 18 creditors he claimed he had on the Petition Date."[28] Montana, it continued, had engaged "in extensive cross examination on the issue"[29] during the hearing, and "Blixseth reiterated his discovery responses and authenticated documents related to each of these creditors."[30]

The bankruptcy court then considered the parties' arguments and the evidence pertaining to the 18 creditors that Blixseth had identified. It determined that the evidence showed that Blixseth owed debts to at least 16 of those creditors on the petition date.[31] The court found that those 16 creditors had continued to provide services to Blixseth and, thus, possessed at least

---

[26] MER 5.

[27] *Id.*

[28] *Id.* Although not included in the parties' excerpts of record, I take judicial notice of the existence of a supplemental declaration that Blixseth filed in support of his first motion to dismiss, filed 16 days after the involuntary petition, to which were attached bills (many of the same produced in discovery) that Blixseth declared were "[c]opies of [his] recent consumer debt billing statements, account numbers redacted, to demonstrate to the Court that [he is] current on such obligations." *In re Timothy L. Blixseth*, No. BK-S-11-15010, ECF No. 32 at 2, 12–32 (Apr. 21, 2011).

[29] MER at 5–6.

[30] *Id.* at 6.

[31] *Id.* at 6–8 (identifying 11 creditors that Blixseth owed ongoing, recurring debts to as of the petition date—Neiman Marcus; Puget Sound Energy; Comcast; Quest; US Bank; Big Horn Golf Club; TransAmerica Life Insurance; Medina Gardening and Landscape, Inc.; Prudential Life Insurance; Chubb Casualty; and ADT—and five professionals that Blixseth owed debts to as of the petition date—Mack, Roberts & Co.; Mike Flynn; Stillman & Associates; Rosen Law; and Hagen & O'Connell).

"accrued but unbilled balances on the [p]etition [d]ate."[32]  The bankruptcy court recounted Blixseth's testimony that, for 11 of these creditors, "periodic, recurring" debts were "owed, undisputed and generally paid in the ordinary course."[33]  As for the five professionals that Blixseth listed among his creditors, the bankruptcy court determined that Blixseth had "authenticated these debts to the court's satisfaction.  He testified and was subject to cross examination as to the existence and validity of these debts, and the court credits his testimony."[34]

The bankruptcy court did not turn to Montana's burden until after it determined that Blixseth had met his initial burden to show that he had at least 12 creditors as of the petition date.[35]  To show that many of Blixseth's creditors were not qualified, Montana argued that they received payments after the petition date and, thus, were not qualified under § 303(b)(2) because the transfers are avoidable under the bankruptcy code.[36]  The bankruptcy court explained that the burden of establishing avoidability rested with Montana, but it found that Montana had not provided evidence to support this argument.[37]  The court pointed out that it was "left to guess what was paid, from what source, and for what consideration."[38]  Because the qualifications for 16 of Blixseth's creditors were not genuinely disputed by Montana, the bankruptcy court did not disqualify them.[39]

---

[32] *Id.* at 6–7.  The bankruptcy court did not extend this finding to debts owed to Lewis Cellars and City of Medina, noting that "[n]either of these debts have the regularity of occurrence that would justify finding that there was an accrual of debts to these entities as of the Petition Date." MER 7 at n.6.

[33] MER 7.

[34] *Id.*

[35] *See id.* at 7–8.

[36] *Id.* at 8.

[37] *Id.*

[38] *Id.*

[39] *Id.*

1   The bankruptcy court's analysis is consistent with the burden-shifting method that

2   Montana advocates. It is also consistent with the Ninth Circuit's *In re Rothery* decision. The

3   only issue in *In re Rothery* was whether the Bankruptcy Appellate Panel properly reversed the

4   bankruptcy court's grant of partial summary judgment against the debtor on the question of

5   whether she had twelve creditors.[40] The Ninth Circuit began its discussion by noting that "[t]he

6   filing of an involuntary case requires the petitioning creditor to meet the burden of proof on the

7   main elements of § 303."[41] It explained that the bankruptcy court had "defined the deficiency

8   and invited . . . [the debtor] to support her bare allegation of more than twelve creditors."[42] But

9   the debtor "declined, arguing that the burden was on . . . [the petitioning creditor]. She was

10  mistaken and that mistake is fatal to her argument on appeal. It was not error to grant summary

11  judgment *sua sponte*. The party opposing summary judgment may not do so based on 'mere

12  allegations.'"[43]

13      Like in *Rothery*, the bankruptcy court held Blixseth to a standard higher than mere

14  allegation. But unlike the debtor in *Rothery*, Blixseth produced far more than allegations to

15  support his contention that he had at least 12 creditors as of the petition date. I conclude that the

16  bankruptcy court did not err when it placed the initial burden on Blixseth to show that he had at

17  least 12 creditors on the petition date and, once met, shifted the burden to the petitioning

18  creditors to show that those creditors were not qualified.

19      ## 2.    *Applying the burden of proof*

20      The next question is whether the bankruptcy court clearly erred when it applied this

21  shifting burden-of-proof standard to the evidence before it. Montana argues that the bankruptcy

22  court ignored the lack of evidence showing that Blixseth owed any of the creditors a debt as of

23

24  _____

25  [40] *In re Rothery*, 143 F.3d 546, 548 (9th Cir. 1998).

26  [41] *Id.*

27  [42] *Id.* at 549.

28  [43] *Id.* at 549–50 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1988)).

the petition date and, instead, relied "on its own speculation that debts should exist."[44]  It also

argues that the undisputed evidence demonstrates that a significant number of Blixseth's alleged

creditors were not qualified because they are recipients of transfers that could be avoided under

11 U.S.C. §§ 547, 548, and 549.[45]

Blixseth produced substantial evidence that he owed debts to 12 or more creditors on the

petition date.  He first offered a list of 18 creditors identifying them by name, type of claim, and

amount owed (or estimation of the amount owed).[46]  Then he produced invoices for 13 of those

creditors; he did not provide invoices for the other five—citing attorney-client and work-product

privilege[47]—but he did state what amounts he owed them and provide their contact information.[48]

Most of the invoices show on their face that Blixseth had an ongoing relationship with the

creditors.[49]  Blixseth provided a declaration stating that, on the petition date, he "had no less than

---

[44] ECF No. 57 at 54.

[45] *Id.* at 54–57.

[46] MER 1397–98.

[47] *Id.*

[48] MER 1403–1438.

[49] *See, e.g.,* MER 1403 (Neiman Marcus invoice showing balance due in March 2011 and prior balance that had been paid); MER 1405 (Medina Gardening and Landscape, Inc. invoice showing balance overpaid in February 2011 with credit applied to balance due in March 2011 and credit $68.99 to be applied going forward); MER 1406–12 (Puget Sound Energy invoices showing balance due in April 2011, prior balances that had been paid for two properties, and usage ranging from August 2009–March 2011 on one property and July 2009–2010 on the other); MER 1413–15 (Comcast invoice and payment history showing balance due and paid in March 2011 and payments to this creditor going back 7 months); MER 1416–21 (U.S. Bank invoices showing balance and minimum payment due in May 2011, balance and minimum payment due in April 2011, and prior balances paid); MER 1422 (Bighorn Golf Club showing balance forward of $22,000); MER 1424 (ADT invoice showing balance due for quarter spanning April 17, 2017–July 16, 2011); MER 1425 (Quest invoice showing balance due in April 2011, including balance forward from previous billing period); MER 1430–38 (Chubb invoices showing installment premiums due in March and April 2011 and payments made since last statement).

9

12 creditors holding undisputed claims that aggregated no less than \$15,325 all of which were being paid when they came due or, in some instances, earlier."[50]

Blixseth also testified extensively about his creditors during the evidentiary hearing on the motion to dismiss.[51] He testified about his beliefs that the 18 creditors have claims against him that are undisputed[52] and that the Neiman Marcus balance was paid on March 24, 2011, based on the hand notation on the invoice, which, to him, appears to belong to his wife.[53] But he also testified that he owes a debt to this creditor "every month."[54] Blixseth testified that he was "pretty sure" he owes Medina Gardening a fixed amount each month.[55] Although Blixseth had overpaid that contractor two months prior, he was certain that "there were more charges" by the petition date.[56] He testified that Puget Sound Energy provides utility services for his personal residence in Medina, Washington,[57] and "didn't shut the lights off. And between the billing cutoff time on this [produced] bill and the next billing, you incur amounts owed, an ongoing undisputed-creditor I would call it amount, and it's—if its roughly \$700, if that's the estimate, that's what it would cost every month."[58] Blixseth did not dispute that the Puget Sound Energy

---

[50] ECF No. 63-1 at 23, ¶ 31 (Blixseth's Excerpts of Record at BER 17–22). Blixseth provided other declarations on this subject and was cross-examined regarding them during the hearing, but none of the parties included Blixseth's other declarations in their excerpts of record.

[51] MER 1482–1593, 373–78, 388–89.

[52] MER 1519 at 42:21–23.

[53] MER 1524 at 47:5–10.

[54] *See* MER 1524–25 at 47:20–48:5.

[55] MER 1525–26 at 48:12–49:16.

[56] MER 1526–27 at 49:23–50:7.

[57] MER 1529 at 52:21–24.

[58] MER 1530 at 53:12–18.

bill he produced had been paid prepetition, but he added that, "[a]s of the petition date, there was money owed to Puget Sound Energy."[59]

Blixseth also testified that his normal practice for his U.S. Bank credit card is to estimate the balance and make a payment over that amount before the due date to avoid interest charges.[60] Blixseth was unsure if the handwritten notation on the Quest bill meant that it had been paid on April 1, 2011, or received on that date.[61] He testified that ADT provided security at a building in Rancho Mirage, California, that was owned by Desert Ranch, Triple LP and in which Blixseth had an office.[62] He was not sure if the "posted" stamp on the invoice meant that it was received or paid on the date handwritten onto the stamp.[63] Blixseth testified that he continued to make charges on his U.S. Bank card and his Neiman Marcus card, he continued to receive services from Puget Sound Energy, Quest, and Comcast, he maintained his membership with Bighorn Golf Club, and he has annual contracts with Prudential and Transamerica that he pays quarterly.[64] As for the five professionals that Blixseth listed among his undisputed creditors, Blixseth testified that he has "ongoing representation" by them for his tax, accounting, and legal needs, and that he incurs charges from them "every single month."[65]

The bankruptcy court found that the evidence showed that Blixseth was indebted to 16 creditors on an ongoing, recurring basis.[66] This finding is supported by the record, and the

---

[59] MER 1531 at 54:13–16.

[60] MER 1539–41 at 62:6–64:21.

[61] MER 1552–54 at 75:9–77:10.

[62] MER 1561–62 at 84:23–85:14.

[63] MER 1562–63 at 85:24–86:17.

[64] MER 375–77 at 93:4–95:7.

[65] MER 1585–87 at 108:23–110:19; *accord* MER 374–75 at 92:19–93:3.

[66] MER 5–8.

11

petitioning creditors did not produce any evidence to contradict it nor did they produce evidence from which contradictory inferences could be drawn.

Montana argues that the bankruptcy court made a mistake when it inferred that Blixseth would have owed debts to these 16 creditors on the petition date.[67] In the summary-judgment context, "courts are required to view the facts and draw all reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'"[68] The bankruptcy court first stated that "[t]he bills themselves were evidence of ongoing, recurring debts, such as cable and electrical service, and it begs common sense to believe that these entities did not provide services after payment, thus possessing accrued but unbilled balances on the Petition Date."[69] It later stated, regarding the U.S. Bank creditor, that "it is reasonable to assume, from the sheer amount of monthly charges, that some new charges would have been incurred and were thus owing as of the Petition Date."[70] But Blixseth specifically testified that he continued to use—and the creditors continued to provide—services for which he was obligated to pay.[71] Because the undisputed evidence showed that Blixseth owed debts to these creditors as of the petition date, there was no need for the bankruptcy court to infer that he did. Thus, I am not persuaded that the bankruptcy court was mistaken about what the evidence showed.

Montana's final argument on this topic is that the bankruptcy court erred when it failed to disqualify many of Blixseth's creditors for receiving preferential, fraudulent, or post-petition

---

[67] ECF No. 57 at 53–54.

[68] *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in the original) (quoting *United States v. Diebold, Inc.*, 369 US. 654, 655 (1962) (per curiam)).

[69] MER 6.

[70] MER 7.

[71] *See, e.g.*, MER 1524–25 at 47:20–48:5 (Neiman Marcus); MER 1526–27 at 49:23–50:7 (Medina Gardening); MER 1530 at 53:12–18 (Puget Sound Energy); MER 375–77 at 93:4–95:7 (U.S. Bank, Quest, Comcast, Bighorn Golf Club, Prudential, Transamerica); MER 374–75 at 92:19–93:3, MER 1585–87 at 108:23–110:19 (Mack, Roberts & Co., Mike Flynn, Stillman & Associates, Rosen Law, and Hagen & O'Connell).

transfers that are avoidable under 11 U.S.C. §§ 547, 548, and 549.[72] The bankruptcy court found that the petitioning creditors had failed to discharge their burden of establishing the avoidability of any transfer to those creditors.[73] I do not find that the bankruptcy court made a mistake on this front either for I, too, "am left to guess" from this record "what was paid, from what source, and for what consideration."[74]

I thus find that the bankruptcy court correctly applied a shifting burden-of-proof standard to assess the number of qualified creditors needed to maintain the involuntary case against Blixseth, and this record does not leave me with a definite and firm conviction that the bankruptcy court made a mistake in that assessment. I therefore affirm the bankruptcy court's decision that three qualified creditors were needed to maintain the involuntary bankruptcy case against Blixseth.

**B.    Were there three qualified creditors?**

The next issue is whether, among the three petitioning and one joining creditors, three of them were qualified under § 303 to maintain the involuntary bankruptcy case against Blixseth. Montana argues that the bankruptcy court erred when it determined that petitioning creditors Montana, California, and Idaho were not qualified because their claims were the subject of bona fide disputes.[75] The determination of whether a "bona fide dispute" exists under § 303(b) "is essentially a factual inquiry" and reviewed under "a clearly erroneous standard of review."[76] "However, when the issue . . . is made in the context of a summary[-]judgment analysis, it is not

---

[72] ECF No. 57 at 54–57.

[73] MER 8.

[74] *See id.*

[75] ECF No. 57 at 31–41.

[76] *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1064 (9th Cir. 2002).

13

based upon an assessment of the credibility of witnesses or other facts in evidence."[77]  Thus, it is

reviewed "de novo rather than applying a clearly erroneous standard."[78]

In determining whether a bona fide dispute exists, the court "is not asked to evaluate the

potential outcome of a dispute, but merely to determine whether there are facts that give rise to a

legitimate disagreement over whether money is owed[ ] or . . . how much."[79]  The court is

thus tasked with determining "'whether there is an objective basis for either a factual or a legal

dispute as to the validity [or amount] of the debt.'"[80]

### 1.    *Montana's claim*

Montana argued in the bankruptcy case that it had a "tax claim" against Blixseth in the

amount of "$219,258."[81]  A brief dive into the record is required to understand Montana's claim.

After it audited Blixseth's Montana individual income tax returns (and those of his related

entities) for the 2002–2006 tax years, Montana's Department of Revenue noticed a deficiency

between the amount reported on those returns and what Montana believed it was owed by the

audited entities and individuals.  So, the department sent a deficiency assessment to Blixseth on

July 27, 2009, notifying him of "additional tax, penalties and interest assessed for the years

December 31, 2002 through December 31, 2006."[82]  The notice explained that Montana's "audit

findings resulted in numerous changes to [Blixseth's] Montana and Federal adjusted gross

income."[83]  The department categorized the adjustments into eight "audit issues" and went on to

---

[77] *In re C&C Jewelry Mfg. Inc.*, Nos. CC-08-1190, CC-08-1267, and LA 07-20764, 2001 WL 36340326, at *4 (Bankr. App. 9th Cir. Apr. 14, 2009) (citing *Key v. Mech. Inc. v. BDC 56 LLC*, 330 F.3d 111, 117 (2d Cir. 2003)).

[78] *Id.*

[79] *In re Vortex Fishing Sys., Inc.*, 277 F.3d at 1064.

[80] *Id.* (quoting *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987)).

[81] *See* MER 40.

[82] MER 1131.

[83] *Id.*

describe each in detail.[84]  It also informed Blixseth of his appellate rights: "Failure to file a written objection within 30 days shall be deemed an admission that you agree with this assessment.  ARM 42.2.510.  If you object to the assessment, § 15-1-211, MCA allows for you to provide the basis for your objections in writing, by telephone, or if requested, at an informal conference."[85]

Blixseth timely requested an informal conference to review the deficiency assessment.[86] Following that process, on March 3, 2010, the department sent Blixseth notice that it had made adjustments as a result of the review and provided a breakdown of the amended assessment for the audited tax years.[87]  The letter advised, "[i]f you disagree with this determination, you can send a written request for review or form APLS102F to the Department's Office of Dispute Resolution within 15 days of the date of this letter."[88]

Blixseth timely filed that form with the department's Office of Dispute Resolution, thus appealing the department's final determination as to the deficiencies for tax years 2002–2006.[89] He listed all of the audit issues that the department had raised during the process except for the one termed Audit Issue 4.[90]  That issue concerns a $1,800,000 civil environmental penalty that one of Blixseth's related entities (Yellowstone Development, LLC) was assessed in 2004 for violating the Clean Water Act.[91]  That entity claimed the penalty and other related expenses as a

---

[84] MER 1132–41.

[85] MER 1141.

[86] MER 481–82 at 74:23–75:7.

[87] MER 1147–1149.

[88] MER 1149.

[89] MER 1230.

[90] MER 1230–35.

[91] MER 1137.

15

deduction on its 2004 Montana and federal tax returns, for a total of $2,678,582.[92]  In its

deficiency assessment, the department informed Blixseth that the deduction was denied as

improper.[93]  "Denial of the deduction increased Yellowstone Development's income, which in

turn increased Blixseth Group, Inc.'s income[,]" which had the "cumulative effect" of increasing

the "Federal adjusted gross income and Montana adjusted gross income reported by [him] and

Mrs. Blixseth for tax year 2005."[94]  During the internal review, the department determined that

$878,582 of the original deduction actually was for legitimate environmental expenses, so, in its

final determination, the department stated that it had "adjusted the entity's tax return to reflect

the allowable deduction."[95]  Blixseth did not appeal Audit Issue 4, but he did appeal the rest and

he did not concede liability for a minimum amount of tax owing for those tax years.[96]

On January 7, 2011, the department sent Blixseth a letter with a Statement of Account

listing the amount ($216,657), including interest calculated through January 2011 and late

penalties, that the department decided Blixseth himself owed as a result of its final determination

on Audit Issue 4.[97]  One week later, Blixseth and the department stipulated to move his appeal to

Montana's State Tax Appeals Board (STAB).[98]  That appeal was pending during the entirety of

the bankruptcy case; STAB issued its final order in the appeal on March 20, 2015.[99]

---

[92] See id.

[93] Id.

[94] Id.

[95] MER 1148.

[96] MER 1158–76.

[97] MER 1143–1146.  Some pages of this document state that it is dated January 7, 2010, but the
parties informed the bankruptcy court during the hearing that it "is actually a typo, and it's
supposed to be January 7, 2011."  MER 206–07 at 66:18–67:6.

[98] MER 1155–1157.

[99] See ECF No. 82-1 at 30.

1    Montana's $219,258 claim in the bankruptcy case is for the portion of the deficiency it

2    proposed for the 2004 tax year that stems from Audit Issue 4.  Blixseth disputes both the validity

3    and amount of the debt claimed by Montana, arguing that Montana was not authorized to create a

4    separate liability or claim related to Audit Issue 4.[100]  Blixseth has an objective basis for his legal

5    dispute: whether Montana was authorized to create a separate claim or liability stemming from

6    Audit Issue 4 is a matter of statutory interpretation.

7    Montana contends that Rule 42.2.510 of the Administrative Rules of Montana specifies

8    the procedure that Montana's Department of Resources "must follow" when it issues a deficiency

9    assessment to an individual taxpayer.[101]  The steps taken by Montana and Blixseth perfectly

10   follow ARM 42.2.510's procedures except for Montana's sending Blixseth a Statement of

11   Account on Audit Issue 4 after Blixseth appealed from the department's final determination on

12   the deficiency assessment.  The rule does not expressly state what action the department can take,

13   if any, when a taxpayer appeals some but not all of the disputes identified in the department's

14   final determination on a deficiency assessment, especially an assessment that raises multiple

15   issues and spans many tax years.  I note that the rule speaks in singular terms—"the debt," "the

16   disagreement," and "the matter."  It provides that, once the taxpayer timely appeals the

17   department's final determination on a deficiency assessment to the Office of Dispute Resolution

18   (ODR), "the matter" is then submitted to the ODR and "ARM 42.2.13 through 42.2.621

19   apply."[102]  And it does not expressly allow the department to effectively restart ARM 42.2.510's

20   procedures on an assessed deficiency.

21   Blixseth argues that, to make a portion of a deficiency assessment immediately due and

22   payable, Montana's administrative rules and tax code both provide that the department must

23

24

25   _____

26   [100] ECF No. 63 at 39.

27   [101] ECF No. 57 at 34–35.

28   [102] Admn. R. Mont. 42.2.510(6), (7).

17

issue a jeopardy assessment.[103] The statute and rule both require the department to first find that

collection of a deficiency will be jeopardized by delay and then mail notice of that finding to the

taxpayer, together with a demand for immediate payment of the deficiency declared to be in

jeopardy, including any penalty and accrued interest. It is undisputed that Montana did not issue

a jeopardy assessment. Blixseth also points to a provision in Montana's tax code indicating that

tax must be assessed by the department "on an annual basis, not by individual line item."[104] All

of this, Blixseth says, cuts against Montana's theory that his liability for the deficiency proposed

for the 2004 tax year could—and did—arise in fits and spurts.

The parties have differing interpretations of what Montana's administrative rules and

statutes say the department can do once it sends a deficiency assessment and its final

determination on that assessment has been appealed. I do not find either party's interpretation of

these rules and statutes, and how they interplay with one another, to be absurd. Because

Montana's authority to create a separate liability or tax claim for Audit Issue 4 was legitimately

disputed, so, too, was Blixseth's liability for that debt. Those disputes, in turn, raise substantial

questions about the amount of the debt claimed by Montana in the bankruptcy case. So, I find

that Blixseth raised material issues of law about the validity and amount of Montana's claim.

### 2.    *California's claim*

California's claim is more straightforward: Blixseth's income tax return reflected that he

owed California $690,127 for the 2007 tax year,[105] and with taxes, penalties, and interest,

California calculated that he owed it $986,957.95 on the petition date.[106] Montana argues that the

---

[103] ECF No. 63 at 44 (citing Admn. R. Mont. 42.2.403 (2008); Mont. Code Ann. § 15-30-2631).

[104] ECF No. 63 at 42–43 (discussing Mont. Code Ann. § 15-30-2604, which repeatedly refers to tax liability on a yearly scale).

[105] MER 709.

[106] MER 41.

bankruptcy court erred when it found that California's claim was the subject of a bona fide dispute as to amount.[107]

The settlement agreement that Blixseth and California reached post-petition recites that Blixseth disputes the amount of California's claim because "he is owed a substantial refund" that "he is prepared to litigate" and "that he has other claims against" California's taxing authority.[108] Michael Flynn, one of Blixseth's attorneys who was tapped to testify about Blixseth's disputes with California, testified that he was aware that Blixseth disputed the amount of California's claim because it was likely he would not owe the state anything for the 2007 tax year.[109] California's records show that Blixseth authorized his accountant, Mr. Mack, to deal with that taxing authority on his behalf.[110] California's records also show that on August 25, 2009, Mr. Mack informed California that Blixseth will be entitled to a large refund for the 2008 tax year, as would be shown on his return to be filed on October 15, 2009.[111] According to California's records, the taxing authority responded that it wanted $50,000 to be paid and then it would review the 2008 tax return once filed, and if the refund would satisfy Blixseth's debt in full, that would be processed, but if not, Blixseth would have to negotiate a payment plan.[112]

California's records show that on October 16, 2009, the first two pages of Blixseth's return for the 2008 tax year were faxed to the taxing authority and the original had been mailed to it.[113] California's records state that the tax return shows Blixseth's adjusted gross income for

---

[107] ECF No. 57 at 31–33.

[108] MER 821.

[109] MER 1626 at 149:10–24.

[110] ECF No. 63-1 at 69.

[111] *Id.*

[112] *Id.*

[113] *Id.* at 65.

2008 was a loss of $18,226,044.[114]  The large loss that Blixseth suffered for the 2008 tax year is the basis for his argument that he is entitled to a large refund from California and, thus, his dispute about the amount of its claim (e.g., a tax loss to carry back to 2007).  Based on this record, I find that Blixseth raised material issues of fact regarding the amount of California's claim.

### 3.    Interpreting 11 U.S.C. § 303(b)'s "bona fide dispute as to . . . amount"

Montana argues that the bankruptcy court erred when it determined that 11 U.S.C. § 303(b), as amended in 2005, now provides that any bona fide dispute as to the amount of a petitioning creditor's claim is sufficient to render that creditor unqualified under the statute.[115]  I reach this issue because I find that Montana's and California's claims were both genuinely disputed as to amount.  District courts review issues of federal statutory construction, including interpretations of the bankruptcy code's provisions, de novo.[116]

### a.    Section 303(b)'s history

"As originally enacted, § 303 did not exclude creditors' claims that were the subject of bona fide disputes."[117]  Language was added to the statute by the Bankruptcy Amendments and Federal Judgeship Act of 1984[118] to provide that an involuntary case can be commenced against a person by an entity that is the "holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute . . . ."[119]  But the Code did not define bona fide

---

[114] *Id.*

[115] ECF No. 57 at 44–49.

[116] *In re Marciano*, 459 B.R. 27, 35 (Bankr. App. 9th Cir. 2011) (citing *In re BCE W., L.P.*, 319 F.3d 1166, 1170 (9th Cir. 2003)).

[117] *In re Mountain Dairies, Inc.*, 372 B.R. 623, 632 (Bankr. S.D.N.Y. 2007) (quoting *In re BDC 56 LLC*, 330 F.3d 111, 117 (2d Cir. 2003), *abrogated on other grounds by In re Zarnel*, 619 F.3d 156 (2d Cir. 2010)).

[118] *Id.*

[119] 11 U.S.C. § 303(b)(1) (Apr. 19, 2005).

1  dispute, so courts interpreted § 303(b) to derive its meaning. In the Ninth Circuit, this began

2  with the proposition "that the existence of a counterclaim against a creditor does not

3  automatically render the creditor's claim the subject of a 'bona fide dispute.'"[120]

4       The Ninth Circuit revisited the issue in *In re Vortex Fishing Systems, Inc.*, adopting an

5  objective test to determine whether a claim is subject to a bona fide dispute "regarding liability or

6  amount."[121] It came back to the issue in *In re Focus Media, Inc.*, stating its disagreement with

7  the "contention that an uncertainty or dispute as to amounts owed above . . . [the statutory

8  threshold] can create a bona fide dispute as to the entire debt."[122] The court also stated that it is

9  "a widely accepted proposition regarding involuntary bankruptcy petitions" that "'if at least a

10  portion of the debt that is the subject of the petition is undisputed, the undisputed portion is

11  sufficient to create a debt under Section 303(b)(1) not subject to a bona fide dispute.'"[123]

12       Then, effective April 20, 2005, the statute was amended by the Bankruptcy Abuse

13  Prevention and Consumer Protection Act of 2005 (BAPCPA) to provide that an involuntary case

14  can be commenced against a person by three or more entities, "each of which is . . . a holder of a

15  claim against such person that is not contingent as to liability or the subject of a bona fide dispute

16  as to liability or amount . . . ."[124] This sparked a disagreement among courts about whether the

17  amendment displaced judicial gloss that narrowed the meaning of bona fide dispute as it pertains

18  to the amount of a claim.

19       Many bankruptcy courts found that the 2005 amendment "overrules prior decisions

20  holding that the dispute about the amount of a claim disqualifies the petitioning creditor only if

21

22

---

23  [120] *In re Seko Inv., Inc.*, 156 F.3d 1005, 1008 (9th Cir. 1998).

24  [121] *In re Vortex Fishing Systems, Inc.*, 277 F.3d at 1064–65.

25  [122] *In re Focus Media, Inc.*, 378 F.3d 916, 926 (9th Cir. 2004).

26  [123] *Id.* (quoting *IBM Credit Corp. v. Compuhouse Sys., Inc.*, 179 B.R. 474, 479 (W.D. Pa. 1995),
27  and collecting other authorities) (alteration omitted).

28  [124] 11 U.S.C. § 303(b)(1) (Apr. 20, 2005).

1   the undisputed portion of the claim is less than the statutory minimum amount."[125] Two circuit

2   courts have agreed with this reasoning.  When the Fifth Circuit examined the issue in *In the*

3   *Matter of Green Hills Development Co., LLC*, it determined that the bankruptcy court's reliance

4   on the Ninth Circuit's pre-BAPCPA *Seko* case was "misplaced."[126] The Fifth Circuit

5   distinguished *Seko* from the case before it, explaining that *Seko* "concerned only the treatment of

6   *unrelated* counterclaims advanced by a debtor as a potential offset to the creditor's debt[,]" not a

7   bona fide dispute that "directly calls into question [the debtor's] liability under the Note,

8   including the amount it may owe."[127] It also found that "the addition of the phrase 'as to liability

9   or amount' to § 303(b) eliminated the textual justification that existed [to narrow the statute's

10  meaning] prior to the BAPCPA."[128] The Fifth Circuit thus concluded that, "even if *Seko* remains

11  valid in the Ninth Circuit after BAPCPA, [it] has never adopted [*Seko*'s] holding, and [it] [saw]

12  no reason to adopt it now."[129]

13          The First Circuit took up the issue in *Fustolo v. 50 Thomas Patton Drive, LLC*.[130] Similar

14  to what Montana seeks here, the creditor in *Fustolo* asked the First Circuit "to rule that any

15  ───────────────────

16  [125] *In re Honolulu Affordable Housing Partners, LLC*, No. 15-00146, 2015 WL 2203473, at *2

17  (Bankr. D. Haw. May 7, 2015); *accord In re Excavation, Etc., LLC*, No. 09-60953, 2009 WL
    1871682, at *2 (Bankr. D. Or. June 24, 2009); *In re Elverson*, 492 B.R. 831, 835 (Bankr. E.D.

18  Penn. 2013); *In re Vicor Techs., Inc.*, No. 12-39329, 2012 WL 1397460, at *5 (Bankr. S.D. Fla.
    Apr. 5, 2013); *In re Rosenberg*, 414 B.R. 826, 845–46 (Bankr. S.D. Fla. 2009); *In re Reg'l*

19  *Anesthesia Assocs. PC*, 360 B.R. 466, 469–70 (Bankr. W.D. Pa. 2007); *In re Euro-Am. Lodging*

20  *Corp.*, 357 B.R. 700, 712 n.8 (Bankr. S.D.N.Y. 2007); *see In re Mountain Dairies, Inc.*, 372 B.R.
    623, 634 (Bankr. S.D.N.Y. 2007) (recognizing that the "definition of 'bona fide dispute[ ]' has

21  likely been altered by BAPCPA"); *In re Hentges*, 351 B.R. 758, 763 (Bankr. N.D. Okla. 2006)
    (finding that a bona fide dispute as to a portion of the claim sufficient to disqualify petitioning

22  creditor).

23
    [126] *In the Matter of Green Hills Dev. Co., LLC*, 741 F.3d 651, 658 (5th Cir. 2014).
24
    [127] *Id.* at 657–58.
25
    [128] *Id.* at 658.
26
    [129] *Id.*
27
    [130] *Fustolo v. 50 Thomas Patton Drive, LLC*, 816 F.3d 1 (1st Cir. 2016).
28

dispute concerning the amount of the liability represented by the judgment can be ignored, because the amount admittedly owed well exceeds the amount necessary to justify . . . [the creditor's] joinder as a petitioning creditor under 11 U.S.C. § 303(b)(1)."[131]  Citing the Ninth Circuit's *Focus Media* case, among others, the First Circuit explained that, "[p]rior to 2005, some courts had held—as the bankruptcy court held here—that a claim to a disputed amount could nevertheless form the basis of an involuntary petition if the undisputed portion of the claim could independently qualify the creditor."[132]  It then discussed the 2005 amendment and subsequent court split about whether it "was intended to change the prevailing law by establishing that a dispute as to any portion of a claim . . . means there is a bona fide dispute as to amount of the claim or simply to reinforce the then-prevailing interpretation."[133]

The First Circuit "decline[d] to read a materiality requirement into section 303."[134]  It reasoned that "the bona fide dispute provision strikes a balance between the Bankruptcy Code's dual purposes of ensuring the orderly disposition of creditors' claims and protecting debtors from coercive tactics.  Limiting petitioning creditors to only those claims that are of undisputed value is in line with those aims."[135]  Thus, the court "follow[ed] the straightforward reading of section 303, which places no qualifiers on the requirement that any asserted claim be free of 'bona fide dispute as to . . . amount.'"[136]

But some bankruptcy courts have found that, even after the amendment, "[t]he better reasoned authority suggests that a petitioning creditor is not disqualified even if a bona fide

---

[131] *Id.* at 9.

[132] *Id.* (collecting cases).

[133] *Id.* (internal citations, quotation marks, and quoted reference omitted).

[134] *Id.* at 10.

[135] *Id.* (internal citation omitted).

[136] *Id.*

1   dispute exists regarding a *portion* of its claim."[137]  Montana asks me to follow this line of

2   authorities and hold that the 2005 amendments simply clarified the prevailing interpretation that

3   a dispute over amount is bona fide only if it lowers the claims below the statutory threshold.

4   Montana's interpretation has its origin in *In re DemirCo Holdings, Inc.*, in which a bankruptcy

5   court in the District of Illinois examined the legislative history for the 1984 amendment and

6   determined that the 2005 amendment "appears to clarify the prior legislative intent[:]" "the

7   addition of the 'bona fide dispute' phrase to the statute [in 1984] originally was intended to cover

8   disputes as to both liability and amount."[138]

9       I am skeptical of this analysis because "[t]he starting point in discerning congressional

10  intent is the existing statutory text, and not the predecessor statutes."[139]  Indeed, "[i]t is well

11  established that when the statute's language is plain, the sole function of the courts—at least

12  where the disposition required by the text is not absurd—is to enforce it according to its

13  terms."[140]  So, I begin my analysis with the text of the present statute.[141]

14          *b.*      *The statute is not ambiguous.*

15      When interpreting a statute, courts "need not go beyond its language unless it is

16  ambiguous or rendered so by other statutory language in conflict with it."[142]  It is only when

17

18

19

---

20  [137] *In re Tucker*, No. 5:09-bk-914, 2010 WL 4823917, at *6 (Bankr. N.D. W. Va. Nov. 22, 2010)
    (citing *In re DemirCo Holdings, Inc.*, No. 06-70122, 2006 WL 1663237, at *3 (Bankr. C.D. Ill.

21  June 9, 2006)); *accord In re Stewart*, Nos. 14-03177, 14-03179, 2015 WL 1282971, at *6
    (Bankr. S.D. Ala. Mar. 18, 2015); *In re Em Equip., LLC*, 504 B.R. 8, 18 (Bankr. D. Conn. 2013);

22  *In re Miller*, 489 B.R. 74, 82–83 (Bankr. E.D. Tenn. 2013).

23  [138] *In re DemirCo Holdings, Inc.*, 2006 WL 1663237, at *3.

24

25  [139] *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) (internal citation omitted).

26  [140] *Id.* (quotation marks and quoted reference omitted).

27  [141] *See id.*

28  [142] *Green v. Commissioner of Internal Revenue*, 707 F.2d 404, 405 (9th Cir. 1983).

1  ambiguity exists that courts "examine the legislative history to determine Congress's intent."[143]

2  "A statute is ambiguous if it gives rise to more than one reasonable interpretation."[144]

3        In order to qualify as a petitioning creditor under § 303(b), an entity must: (1) hold a

4  claim against the involuntary debtor that is not (a) "contingent as to liability or" (b) "the subject

5  of a bona fide dispute as to liability or amount," and (2) the "noncontingent, undisputed claims"

6  must aggregate in the amount of or beyond the statutory threshold.[145]  The statute places no

7  qualifier or limit on "bona fide dispute as to . . . amount."  The text does not indicate that a bona

8  fide dispute as to amount is relevant or material only if it lowers the claims below the statutory

9  threshold.  The statute's plain language suggests that any bona fide dispute as to the entire

10  amount of a claim disqualifies it from being used as the basis for an involuntary bankruptcy

11  petition.

12        The Supreme Court instructs that courts "should prefer the plain meaning [of a statute]

13  since that approach respects the words of Congress.  In this manner, [courts] avoid the pitfalls

14  that plague too quick a turn to the more controversial realm of legislative history."[146]  Indeed,

15  "canons of construction are no more than rules of thumb that help courts determine the meaning

16  of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon

17  before all others"[147]—"courts must presume that a legislature says in a statute what it means and

18  means in a statute what it says there."[148]  "When the words of a statute are unambiguous, then,

---

[143] *Id.*

[144] *Woods v. Carey*, 722 F.3d 1177, 1181 (9th Cir. 2013) (quotation marks and quoted references omitted).

[145] 11 U.S.C. § 303(b).

[146] *Lamie*, 540 U.S. at 536.

[147] *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

[148] *Id.*

25

1  this first canon is also the last: 'judicial inquiry is complete.'"[149]  I prefer the plain meaning of

2  this statute, and I do not find that it is ambiguous.

3          *c.*     **The statute's plain meaning does not lead to absurd results.**

4         Montana argues that I should disregard the statute's plain meaning because it leads to

5  absurd results. Courts may "refuse to give effect to Congress's chosen words when applying the

6  plain language of the statue would lead to patently absurd results."[150]  One of Montana's

7  authorities posits that the result is absurd because, when "[t]aken to an extreme, if $99,900 of a

8  $100,000 debt was undisputed but $100 was disputed, an alleged debtor could seek to disqualify

9  the petitioning creditor."[151]  Another of Montana's authorities expresses a similar concern with a

10  litany of unanswered questions like "Why would Congress want to disqualify a creditor whose

11  claim is noncontingent and at least partially undisputed?"[152]

12         I find that the First Circuit's analysis in *Fustolo* is instructive in addressing the absurdity

13  argument. The *Fustolo* court explained that "[t]he self-evident purpose of the no bona fide

14  dispute requirement, as courts have repeatedly recognized, is to prevent creditors from using

15  involuntary bankruptcy to coerce a debtor to satisfy a judgment even when substantial questions

16  may remain concerning the liability of the debtor."[153]  "With that purpose in mind, courts

17  generally try to determine whether, objectively, there is a dispute about a debt that reasonably

18  warrants resolution by a factfinder or, in the case of a dispute of law, a court."[154]  "When such a

---

20  [149] *Id.* at 254 (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).

22  [150] *Amalgamated Transit Union Loc. 1309, AFL-CIO v. Laidlaw Transit Srvs., Inc.*, 448 F.3d 1092, 1098 (9th Cir. 2006) (citing *United States v. Brown*, 333 U.S. 18, 27 (1948)).

23  [151] *In re 3 Man Corp.*, No. 5-12-bk-00879, 2014 WL 4346747, at *4 (Bankr. M.D. Penn. Aug. 29, 2014), *set aside on reconsideration on other grounds by* 2016 WL 1599781 (Bankr. M.D. Penn. Apr. 18, 2016).

26  [152] ECF No. 57 at 46 (citing 2 *Collier on Bankruptcy* ¶ 303.11[2] (16th ed. 2013)).

27  [153] *Fustolo*, 816 F.3d at 7 (internal quotation marks and quoted references omitted).

28  [154] *Id.*

dispute exists, we do not allow the creditor to coerce the debtor's surrender by credibly threatening to use the claim as a basis for an involuntary petition."[155]  By declining to read a materiality requirement into § 303(b), the First Circuit sought to maintain the "balance between the Bankruptcy Code's dual purposes of ensuring the orderly disposition of creditors' claims and protecting debtors from coercive tactics"—a balance that is struck by the bona-fide-dispute provision.[156]

      Considering the dual purposes of the bankruptcy code and the balance that it strives to attain, I cannot conclude that Congress's decision to exclude claims that are objectively disputed as to amount leads to results so absurd that I would be required "to treat the text as if it were ambiguous."[157]  The result could be considered harsh in the most extreme cases, but "[i]t is enough that Congress intended that the language it enacted would be applied as [I] have applied it.  The remedy for any dissatisfaction with the results in particular cases lies with Congress and not with this [c]ourt.  Congress may amend the statute; [I] may not."[158]

      Montana's "argument stumbles on still harder ground in the face of another canon of interpretation."[159]  Its interpretation of § 303(b)—reading "bona fide dispute as to . . . amount" to refer only to "relevant" or "material" amounts (i.e., those that lower the petitioning claims below the statutory threshold)—"would have [me] read an absent word into the statute."[160]  Thus, Montana's argument "would result 'not [in] a construction of [the] statute, but, in effect,'" a narrowing "'of it by the court, so that what was [included], presumably by inadvertence, may be

---

[155] *Id.*

[156] *Id.* at 10.

[157] *See Lamie*, 540 U.S. at 536.

[158] *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 576 (1982).

[159] *See Lamie*, 540 U.S. at 538.

[160] *See id.*

27

1   [omitted] [from] its scope.'"[161]  The Supreme Court has repeatedly emphasized that "'[t]here is a

2   basic difference between filling a gap left by Congress'[s] silence and rewriting rules that

3   Congress has affirmatively and specifically enacted.'"[162]

4                    **d.    *Clarification vs. substantive change***

5           Montana also argues that the legislative history of the 1984 amendments shows that the

6   2005 amendments simply clarified that "bona fide dispute" was always intended to cover

7   disputes about both liability and amount.[163]  So, Montana continues, the 2005 amendments

8   cannot be interpreted as displacing the Ninth Circuit's rule that a dispute about amount "is

9   relevant only if it takes the total debt below" the statutory threshold.[164]  "An amendment in the

10  face of an ambiguous statute or a dispute among the courts as to its meaning indicates that

11  Congress is clarifying, rather than changing, the law."[165]  But Montana does not argue—let alone

12  establish—that the 1984 version of this statute was ambiguous or that its meaning was disputed

13  among the courts.  Indeed, less than one year before the 2005 amendment, the Ninth Circuit

14  explained that it is "a widely accepted proposition regarding involuntary bankruptcy petitions"

15  that, "if at least a portion of the debt that is the subject of the petition is undisputed, the

16  undisputed portion is sufficient to create a debt under Section 303(b)(1) not subject to a bona fide

17  dispute."[166]  This indicates that the 2005 amendments, under Montana's argument, affected a

18  change in the law, not a clarification.

19

20  _____

21  [161] *C.f. id.* (alterations adding "in" and "the" in the original) (quoting *Iselin v. United States*, 270

22  U.S. 245, 251 (1926)).

23  [162] *Id.* (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)).

24  [163] ECF No. 57 at 47–48.

25  [164] *In re Focus Media, Inc.*, 378 F.3d at 925–26.

26  [165] *ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 691 (9th Cir. 2000).

27  [166] *In re Focus Media, Inc.*, 378 F.3d at 926 (capitalization alteration, quotation marks, and

28  quoted reference omitted) (collecting cases).

Montana also argues that the fact that the 2005 amendments are expressly retroactive and contained in the "technical amendments" portion of the BAPCPA bolsters its argument that Congress was merely clarifying the law.[167]  But there is no dispute here that the 2005 amendments apply to this 2011 involuntary bankruptcy case.  And I do not view express retroactivity as Congress showing its hand in the clarifying vs. changing debate because, as the Supreme Court's "decisions make clear," Congress "may amend the law and make the change applicable to pending cases, even when the amendment is outcome determinative."[168]  Nor do I find that the "technical" label that these amendments fall under determines their scope or application.[169]

I find that § 303(b), as amended under the BAPCPA in 2005, unambiguously disqualifies a creditor whose claim is the subject of *any* bona fide dispute as to amount.  This plain-meaning application does not effect patently absurd results but, rather, is in line with the congressional intent to balance the bankruptcy code's dual purposes.  I therefore affirm the bankruptcy court's decision interpreting § 303(b) to mean that any bona fide dispute over the amount of a claim disqualifies a petitioning creditor.  Thus, I also affirm its conclusion that California and Montana were not qualified petitioning creditors under 11 U.S.C. § 303(b) because their claims were the subjects of bona fide disputes as to amount and, in Montana's case, validity.

## C.    The parties' remaining issues are moot.

There must be at least three qualified creditors to maintain an involuntary bankruptcy case against Blixseth, and there are four contenders: Montana, California, Idaho, and Yellowstone.  Having found that half of these creditors are disqualified because their claims are the subject of bona fide disputes, I am left with Montana's argument that the bankruptcy court

---

[167] ECF No. 69 at 47–49.

[168] *Bank Markazi v. Peterson*, ___ U.S. ___, 136 S.Ct. 1310, 1317 (2016).

[169] *See Asociacion De Empleados Del Area Canalera v. Panama Canal Com'n*, 329 F.3d 1235, 1240 n.3 (11th Cir. 2003) (collecting cases) (finding argument that technical amendments "do not make substantive changes in the law" to be "untenable").

1   erred when it determined that Idaho's claim was subject to a bona fide dispute and Blixseth's

2   cross-appeal argument that the bankruptcy court erred when it determined that Yellowstone's

3   claim is not subject to § 303(b)'s qualifications. I need not decide these issues because,

4   regardless of the outcome, it will not change the fact that there was an insufficient number of

5   qualified creditors to sustain the involuntary bankruptcy case against Blixseth. I therefore

6   decline to address these remaining issues.

7   **D.**     **Motion for leave to file supplemental authorities**

8       Montana moves under FRBP 8014(f) for leave to file citation of supplemental authorities

9   that were issued after the parties' briefs were filed in this case.[170] Blixseth responds that the

10   request is unnecessary and a procedurally improper attempt to exceed the word limit.[171] I

11   encountered the proposed supplemental authorities in my own review of the jurisprudence and

12   considered them in the course of deciding the issues raised in this case. I therefore grant

13   Montana's motion for leave to file its supplemental authorities.

14                           **Conclusion**

15       Accordingly, I **AFFIRM** the bankruptcy court's decision to dismiss the involuntary

16   bankruptcy case against Blixseth and **GRANT** Montana's motion [**ECF No. 85**] for leave to file

17   supplemental authorities. The Clerk of Court is directed to CLOSE THIS CASE.

18       DATED: December 15, 2017.

19

20                                   U.S. District Judge Jennifer A. Dorsey

21

22

23

24

25

26

27   [170] ECF No. 85.

28   [171] ECF No. 86.